OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This appeal, like
 
 Campaign for Fiscal Equity v State of New York
 
 (100 NY2d 893 [2003] [decided today]
 
 [CFE II\),
 
 claims that the State failed in its promise, made in the Education Article of the State Constitution, to afford its children the opportunity for a sound basic education (NY Const, art XI, § 1).
 

 This appeal is unlike
 
 CFE II geographically
 
 — it concerns the Rochester City School District (RCSD) rather than New York City;
 
 procedurally
 
 — it is here after dismissal of the complaint on a pleadings motion rather than after trial; and perhaps most significantly of all,
 
 conceptually.
 
 Whereas
 
 CFE II
 
 premised its action on the State’s failure to fund the New York City education system, plaintiffs here claim no inadequacy of
 
 *438
 
 teaching, facilities or instrumentalities of learning. Rather, they charge that the State’s fault lies in practices and policies that have resulted in high concentrations of racial minorities and poverty in the school district, leading to abysmal student performance. We agree with the Appellate Division that plaintiffs’ novel theory does not constitute a claim under the Education Article, and the complaint was therefore correctly dismissed.
 

 Plaintiffs are 15 African-American schoolchildren who reside in the City of Rochester and attend public schools in the RCSD. They purport to represent a class of all children, and a subclass of racial minority children, who attend these schools. Defendants are the State of New York, the Regents of the University of the State of New York and their Chancellor, the New York State Education Department and its Commissioner (collectively, the State), and the RCSD and all 24 suburban school districts located wholly or partly within Monroe. County (School Districts). Plaintiffs originally sued only the State, but were directed to join the School Districts (270 AD2d 819 [4th Dept 2000]). They have done so in their second amended complaint, which is the subject of defendants’ dismissal motion.
 
 [1]
 

 Plaintiffs allege that their schools have high levels of poverty concentration and racial isolation; that these attributes correlate with substandard academic performance; and that by every measure of student achievement RCSD schools do not deliver a sound basic education as required by the Education Article. They further allege that the State’s system of school residency requirements and nonresident tuition requirements
 
 (see
 
 Education Law § 3202 [1], [2]), together with other state laws and policies, “enforce and perpetuate segregation of RCSD students by race and economic status,” a condition that the State has taken no affirmative measures to ameliorate. Several individual plaintiffs also allege that they would prefer, but are unable, to attend better schools which exist elsewhere in Monroe County. Plaintiffs do not, however, allege that the substandard academic performance in their schools stems from any lack of funds or inadequacy in the teaching, facilities or instrumentalities of learning in the RCSD. Their premise that the State violates the Education Article thus rests not on a lack of educa
 
 *439
 
 tion funding but on its failure to mitigate demographic factors that may affect student performance.
 

 Aside from their Education Article claim, plaintiffs set forth further causes of action alleging on the basis of the same facts that the State has denied them the equal protection of the laws (NY Const, art I, § 11), and alleging, under 42 USC § 1983, that the State’s conduct has a disparate impact on minority students, in violation of title VI of the Civil Rights Act of 1964 and its regulations. Plaintiffs seek declaratory relief and an injunction requiring the State to provide them with a sound basic education; educational opportunities equal to those provided to children in other Monroe County school districts; education in a racially diverse environment not marked by high concentrations of poverty; and ancillary relief.
 

 On defendants’ motions, Supreme Court dismissed the claims against the School Districts on the ground that plaintiffs set forth no allegations and seek no remedies against them (187 Mise 2d 227, 230-231 [2000]). As to the State’s motion, the court further held that plaintiffs failed to state a claim under the Education Article but had set forth viable causes of action under the Equal Protection Clause and title VI. A divided Appellate Division modified by granting the State’s motion in its entirety and dismissing the complaint. We now affirm.
 
 [2]
 

 The Education Article requires the Legislature to “provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated” (NY Const, art XI, § 1). In
 
 Board of Educ., Levittown Union Free School Dist. v Nyquist
 
 (57 NY2d 27 [1982] [Levittown]) we concluded that neither the Education Article nor the Equal Protection Clause requires the State to provide equal educational opportunities in every school district. We recognized, however, that students have a constitutional right to a “sound basic education” and could prove a violation of this right by demonstrating “gross and glaring inadequacy” in their schools
 
 (id.
 
 at 48).
 

 Thirteen years later, we held that plaintiffs alleging such inadequacy in the New York City schools had set forth a viable cause of action
 
 (see Campaign for Fiscal Equity v State of New York,
 
 86 NY2d 307 [1995]
 
 [CFE
 
 I]). As we explained, a sound
 
 *440
 
 basic education consists of “the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury”
 
 (id.
 
 at 316). The right to such an education, in turn, entails that children are entitled to schools that provide various “essentials”:
 

 “Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas”
 
 (id.
 
 at 317).
 

 As we further explained, evidence of whether students are receiving a sound basic education may include — in addition to proof about these essentials — facts showing the outcomes of the educational process, such as examination results. Such facts, we warned, must be used cautiously, as “a myriad of factors” influence student performance
 
 (id.).
 
 Finally, we indicated that the
 
 CFE
 
 plaintiffs would “have to establish a causal link between the present funding system and any proven failure to provide a sound basic education” to them
 
 (id.
 
 at 318).
 

 Thus, the elements of the
 
 CFE
 
 plaintiffs’ viable Education Article claim consisted of evidence, first, that the State fails to provide them a sound basic education in that it provides deficient inputs — teaching, facilities and instrumentalities of learning — which lead to deficient outputs such as test results and graduation rates; and, second, that this failure is causally connected to the funding system.
 

 The complaint in the present action tests whether an Education Article claim by students against the State may consist of an abundance of terrible educational results — some of the lowest test scores and graduation rates in the state — with no assertion that these results are caused by any deficiency in teaching, facilities or instrumentalities of learning, or any lack of funding. The cause they allege is the demographic composition of the school district in which they reside, together with the existence of obstacles to attending school in another district. In
 
 *441
 
 their own words, plaintiffs believe they are not at all required to “allege inadequate educational services to state a claim,” though they have done so inasmuch as “the students who attend a given school are indeed the most important ‘input’ affecting the operation of the school and the resources needed in that school.” Thus, the only deficient input plaintiffs allege is the composition of the student body of RCSD schools.
 
 [3]
 
 Plaintiffs say that no matter how well the State funds their schools, if plaintiffs and their classmates fail, it is the State’s responsibility to change the school population until the results improve. The issue is whether a complaint so framed can withstand a motion to dismiss.
 

 In fairness to plaintiffs, we acknowledge that they cite research correlating concentrated poverty and racial isolation with poor educational performance, and that evidence founded on such research might enhance an otherwise sufficient Education Article claim. Further, in the present procedural posture — a motion to dismiss the complaint — we must accept as true that a correlation exists; that plaintiffs attend schools populated overwhelmingly by poor and minority students who achieve inadequate educational results; and that, as a practical matter, plaintiffs have no alternative but to live where they do and attend schools in the RCSD. Indeed, they have every right to do so and to expect adequate public schooling. Finally, as a logical and jurisprudential matter, we recognize that in
 
 CFE I
 
 we addressed the sufficiency of the pleadings then before us and had no occasion to delineate the contours of all possible Education Article claims.
 

 Nevertheless, as the Appellate Division concluded, allegations of academic failure alone, without allegations that the State somehow fails in its obligation to provide minimally acceptable educational services, are insufficient to state a cause of action under the Education Article (see 290 AD2d at 101-102). The causes of academic failure may be manifold, including such factors as the lack of family supports and health care. But if the State truly puts adequate resources into the classroom, it satisfies its constitutional promise under the Education Article, even though student performance remains substandard.
 

 
 *442
 
 To embrace plaintiffs’ theory that the State is responsible for the demographic makeup of every school district, moreover, would be to subvert the important role of local control and participation in education. As we observed in
 
 Levittown,
 
 the Education Article enshrined in the Constitution a state-local partnership in which “people with a community of interest and a tradition of acting together to govern themselves” make the “basic decisions on funding and operating their own schools” (57 NY2d at 46). The premise of the Article is thus in part that a system of local school districts exists and will continue to do so because the residents of such districts have the right to participate in the governance of their own schools. The aim of the Article “was to constitutionalize the established system of common schools rather than to alter its substance”
 
 (Reform Educ. Fin. Inequities Today v Cuomo,
 
 86 NY2d 279, 284 [1995]). While we concluded in
 
 CFEI
 
 that the Article creates a right to adequate instruction and facilities — which may entail a duty on the State’s part to provide funding sufficient to bring the educational inputs locally available up to a minimum standard — the State action necessary to ensure such a right does not “alter the substance” of the established system to anything like the same degree as the remedies that would follow from plaintiffs’ theory of their case. That theory has no relation to the discernible objectives of the Education Article.
 

 Holding the State responsible for the demographic composition of every school district, moreover, would mean either making it responsible for where people choose to live, or holding that it must periodically redraw school district lines, negating the preferences of the residents.
 
 [4]
 
 Alternatively, holding that students must be allowed to attend schools outside their districts at no additional cost — essentially, striking down Education Law § 3202 (2) — would likewise diminish local
 
 *443
 
 control and participation, as the residents of more attractive districts would end up having to provide for students from other districts. As the United States Supreme Court has observed, absent “residence requirements, there can be little doubt that the proper planning and operation of the schools would suffer significantly”
 
 (Martinez v Bynum,
 
 461 US 321, 329 [1983]). Plaintiffs assert that less damaging remedies are possible, but suggest no other credible remedies compatible with the concept of their rights asserted in the complaint.
 

 Plaintiffs nevertheless argue that the State is responsible for the concentrated poverty and racial isolation of the RCSD. Their theory is that the State should, and once did, endeavor through the operation of its Urban Development Corporation (UDC) to create low-income housing in the Rochester suburbs, housing that would enable that city’s poor and minority residents to live in less racially isolated and economically depressed neighborhoods. As plaintiffs point out, the UDC’s authority to construct low income housing without local approval was repealed through an amendment of New York State Urban Development Corporation Act § 15
 
 (see
 
 L 1973, ch 446, § 3; McKinney’s Uncons Laws of NY § 6265 [5]). Thus, plaintiffs argue, but for the racially-motivated curtailment of the UDC’s power, there would be more low-income housing, less concentrated poverty and better schools.
 

 The nexus between a 30-year-old amendment to a housing statute and the State’s performance of its duty under the Education Article to provide a sound basic education in Rochester today is attenuated, to say the least. To accept plaintiffs’ theory and allow this action to go forward, we would have to agree that but for the amendment, more low-income housing in the Rochester suburbs would have been funded and built; that poor and minority families would have moved into that housing and not into the RCSD; and that RCSD schools would consequently be better. That speculation simply cannot support a viable claim under the Education Article.
 

 The educational outcomes plaintiffs describe lead us to conclude by joining in the sentiment, expressed by the Appellate Division, of sympathy “to the efforts of the parents of these students to secure the best education possible for their children” (290 AD2d at 96). The remedy, however, does not lie in the theory they have articulated under the Education Article.
 

 Accordingly, the order of the Appellate Division should be affirmed, without costs.
 

 
 *444
 
 Smith, J.
 

 (dissenting). Because I believe that the plaintiffs have properly stated a cause of action under the Education Article, I dissent. Plaintiffs should have the opportunity to show that a racially and socially separate education does not comport with the opportunity of a sound basic education as required by the Education Article of the New York Constitution.
 

 New York Constitution, article XI, § 1 reads: “The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.” The Education Article imposes on the State the mandatory duty to maintain and support a system of public schools where all the children of the state may avail themselves of a sound basic education that will allow them to function productively as civic participants capable of voting and serving on a jury
 
 (Campaign for Fiscal Equity v State of New York,
 
 86 NY2d 307, 316 [1995]
 
 [CFE
 
 I]). It cannot be overstated that it is in the State’s interest that all children be provided with an opportunity for a free, sound education. This, however, is not a self-evident proposition. Those who had the means to educate their own children had to be persuaded to support a system in which they contributed to the education of other people’s children. The latter were primarily the children of the poor. Thus, while the Education Article was enacted to ensure that all the children in the state would have access to a sound education, its enactment was motivated by the plight of poor children.
 

 The Children of the Rochester City School District
 

 Plaintiffs are 15 students in the Rochester City School District (RCSD) who commenced this class action on behalf of 37,000 students in the RCSD. About 90% of these children are poor and about 80% are African-American or Hispanic. The original complaint named the State of New York, the State Education Department (SED), its Commissioner, the Regents and their Chancellor as defendants. An amended complaint added the Rochester school district and surrounding districts.
 

 Relying on the testimony of four experts and statistics compiled by the State, plaintiffs allege that the concentration of poor and minority students in one school district denies them the opportunity of a sound basic education. Plaintiffs allege that this concentration of poor and minority students is the result of state policies, state action and state inaction. Plaintiffs assert causes of action under the Education Article (New York Const, art XI, § 1), the State Equal Protection
 
 *445
 
 Clause (New York Const, art I, § 11), title VI of the Civil Rights Act of 1964 (42 USC § 2000d), and its implementing regulations (34 CFR 100.3 [b] [2] through 42 USC § 1983).
 

 Plaintiffs requested injunctive relief requiring the State to develop a plan to allow them to obtain a sound education. The motion court dismissed the Education Article claim because plaintiffs did not allege the absence of minimally acceptable educational facilities and services. The court did not dismiss plaintiffs’ claims under title VI, and its implementing regulations, giving them the opportunity to show that the enactment of Urban Development Corporation Act § 15 (5) (McKinney’s Uncons Laws of NY § 6265 [5] [L 1968, ch 174, § 1, as amended by L 1973, ch 446, § 3]), prohibiting the New York State Urban Development Corporation from building low income housing without local approval, was racially motivated. As to the equal protection claim, the court found that plaintiffs “are to be given the opportunity to develop, if possible, the historical background, the patterns of discriminatory actions and/or inactions and other factors to establish intentional discrimination as it relates to section 6265 (5)” (187 Misc 2d 227, 237 [2000]). The court dismissed the entire complaint against the suburban districts.
 

 On appeal to the Appellate Division, plaintiffs apparently abandoned their intentional discrimination claims. Thus the Appellate Division considered only the claims under the Education Article and implementing regulations to title VI through 42 USC § 1983. The Court dismissed the complaint in its entirety. In addition to noting that plaintiffs failed to allege a lack of minimal facilities, the Court found that plaintiffs cannot attack resident-based education since that was the system that was constitutionalized by the Education Article. The lone dissent would have reinstated the Education Article claim, noting that “ [a] dequate educational facilities and services do not themselves constitute a sound basic education; rather, they are necessary conditions for the provision of a sound basic education” (290 AD2d 95, 105 [2001]).
 

 The State’s Historical Record
 

 This case cannot be viewed in a vacuum. It must be placed in historical context. During the 19th century, African-Americans in New York constituted a small percentage of the total population (Folts, History of the University of the State of New York and the State Education Department 1784-1996, available at <http://www.nysl.nysed.gov/edocs/education/
 
 *446
 
 sedhist.htm >). Schools for “colored” children were established by laws enacted in 1841 and 1864. The latter statute was challenged by a 12-year-old girl from Brooklyn who commenced an action seeking to be admitted to the all white school in her district. Over the dissent of two Judges, this Court found that separate but equal schools did not violate the Fourteenth Amendment or the State’s Civil Rights Act of 1873
 
 (People ex rel. King v Gallagher,
 
 93 NY 438 [1883]). The holding of
 
 Gallagher
 
 was reaffirmed by
 
 People ex rel. Cisco v School Bd. of Borough of Queens
 
 (161 NY 598 [1900]).
 

 Statutes providing for separate but equal schools for African-Americans were enacted even after the adoption of the Education Article. These statutes were eventually repealed in 1938, at a time when many African-Americans had migrated into the large urban areas of the state, a trend that began during the First World War and continued after the Second World War.
 

 In 1954, the Supreme Court held in
 
 Brown v Board of Educ. of Topeka
 
 (347 US 483 [1954]) that racially separate schools were inherently unequal. The Court stated:
 

 “Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms” (347 US at 493).
 

 Brown
 
 led to a conscientious effort by the State Education Department and the Regents to achieve racial balance in our public schools
 
 (see United States v City of Yonkers,
 
 96 F3d 600 [2d Cir 1996];
 
 Matter of Vetere v Allen,
 
 15 NY2d 259 [1965]). Local school districts, the Legislature, and other state officials resisted this effort. The resistance was so successful that the
 
 *447
 
 SED and the Regents eventually ceased to undertake desegregation efforts. The resistance is documented in
 
 City of Yonkers
 
 (96 F3d 600). The trial court found that not only did the State fail to make any effort to remedy school segregation in Yonkers, but that it took steps to perpetuate it
 
 {id.
 
 at 606). The Regents took affirmative steps to thwart desegregation efforts, including the firing of Commissioner Nyquist, in response to “pressures by New York State officials and constituents who opposed desegregation on grounds that were known to be race-based”
 
 {id.).
 

 In 1969, the Legislature enacted Education Law § 3201 (2) prohibiting the assignment of students in particular schools “for the purpose of achieving equality in attendance * * * of persons of one or more particular races” without the approval of the local board of education. The law was later ruled unconstitutional by a federal court.
 
 [1]
 
 The trial court further found that
 
 “[f]allowing the invalidation of [Education Law 3201 § (2)], the State took measures that had the cumulative effect of undermining efforts to reduce school segregation”
 
 (96 F3d at 606). The State also knew that the construction of subsidized housing would exacerbate segregation in housing and schools. The Second Circuit, in 1996, found New York officials liable under 42 USC § 1983, and the State, the SED, and the Regents liable under the Equal Educational Opportunities Act.
 

 Education Article Litigation
 

 In 1974, the same year “the Regents revised their policy statement on segregation so as to ‘dilute [ ] [its] pro-desegregation force’ ”
 
 (id.), Board of Educ., Levittown Union Free School Dist. v Nyquist
 
 (57 NY2d 27 [1982]) was commenced in Supreme Court, Nassau County. The plaintiffs consisted of the boards of education of 27 districts and 12 elementary and high school students, later joined by the boards of the four largest cities, New York City, Buffalo, Rochester, and Syracuse, and 12 other city school children.
 

 Plaintiffs alleged a violation of the Education Article and the Equal Protection Clauses of the State and Federal Constitutions. Justice L. Kingsley Smith, after an eight-month trial, ruled in plaintiffs’ favor on all grounds. Plaintiffs’ complaint centered on the wide disparities in funding among the State’s 700 school districts based on a financing system that relied largely on local property taxes except in the large
 
 *448
 
 cities, which were fiscally dependent and had many noneducational expenses. Plaintiffs also claimed that the scheme established by the Legislature “denies to some children, based on the lesser real property wealth of their school districts, the means to participate meaningfully as citizens and to function successfully in the labor market” (94 Mise 2d 466, 478 [1978]). The cities specifically claimed that they were treated as property-wealthy by the State’s formula that did not take into account the costs of providing municipal services that other areas of the state did not provide. The cities also argued that the State’s formula undertook, but failed, to provide additional resources to school districts with high need students.
 

 For the noncity plaintiffs, the court applied an intermediate level of scrutiny and found a violation of the Equal Protection Clauses. The court also found that the funding scheme did not satisfy the Education Article’s requirement that the Legislature maintain and support a system of free common schools (94 Mise 2d at 528). As to the cities, the court found that the formula lacked a rational basis. With respect to the Education Article, the court found that “[b]y providing reduced aid per pupil and reduced supplemental aid per special needs pupil to the large city school districts and by failing to take into account adequately their major education overburdens, including their large numbers of pupils lacking the basic minimal educational skills, the State aid formula violates section 1 of article XI of the New York State Constitution” (94 Mise 2d 466, 534 [1978]). Finally, the court found that “there is an equal protection violation as well because of the resulting denial of equal educational opportunity.”
 
 (Id.)
 

 In an opinion by Justice Leon D. Lazer, the Appellate Division affirmed except for the federal equal protection claim (83 AD2d 217 [1981]). The Court concluded as follows:
 

 “In the face of evidence demonstrating that large numbers of children emerge from the school system lacking even the minimal tools necessary to function in society, and that the current financing scheme is in good measure a cause for the failures, we must conclude that the education article is violated by a method of financing which fails to establish a school system capable of providing an education for many educable children”
 
 (id.
 
 at 251).
 

 The concurring opinion of Justice Weinstein noted that “[i]n giving less aid to city students, the education aid formula has
 
 *449
 
 a disproportionately adverse effect not only on pupils from impoverished families, but also with respect to race, country of origin and alienage”
 
 (id.
 
 at 254).
 

 This Court reversed and dismissed the case. The Court acknowledged “significant inequalities in the availability of financial support for local school districts, ranging from minor discrepancies to major differences, resulting in significant unevenness in the educational opportunities offered” (57 NY2d at 38). The Court then stated:
 

 “No claim is advanced in this case, however, by either the original plaintiffs or the intervenors that the educational facilities or services provided in the school districts that they represent fall below the State-wide minimum standard of educational quality and quantity fixed by the Board of Regents; their attack is directed at the existing disparities in financial resources which lead to educational unevenness above that minimum standard.”
 
 (Id.)
 

 As to the equal protection claims, the Court found that education was not a fundamental constitutional right, and reviewed the financing scheme under a rational basis standard. This characterization resulted in the dismissal of the claims. As to the Education Article claim, the Court based its finding largely on the perception that “[w]hat appears to have been contemplated when the education article was adopted at the 1894 Constitutional Convention was a State-wide system assuring minimal acceptable facilities and services in contrast to the unsystematized delivery of instruction then in existence within the State” (57 NY2d at 47). Yet, the Court determined that the legislative history of the Education Article was “irrelevant” to the determination of what was intended
 
 (id.
 
 at 48 n 6). The Court then interpreted the Education Article to connote “a sound basic education,” which was being met since “New York has long been regarded as a leader in free public education.”
 
 (Id.
 
 at 48.) Finally, the Court stated that it would be unwilling to override the Legislature’s decision of how to distribute funds “in the absence, possibly, of gross and glaring inadequacy — something not shown to exist in consequence of the present school financing system” (57 NY2d at 48-49).
 

 In response to the dissent, the majority stated, “The dissent illustrates the very great, and perhaps understandable, temptation to yield to a result-oriented resolution of this litigation”
 
 (id.
 
 at 49 n 9).
 

 
 *450
 
 Judge Fuchsberg, the lone dissenter, took issue with the majority’s finding that education was not a fundamental right:
 

 “In any meaningful ordering of priorities, it is in the impact education makes on the minds, characters and capabilities of our young citizens that we must find the answer to many seemingly insoluble societal problems. In the long run, nothing may be more important — and therefore more fundamental — to the future of our country. Can it be gainsaid that, without education there is no exit from the ghetto, no solution to unemployment, no cutting down on crime, no dissipation of intergroup tension, no mastery of the age of the computer?” (57 NY2d at 51).
 

 Judge Fuchsberg relied on legislative history, including the report of the committee that drafted the Education Article, for his position. He addressed the failure of the formula to provide fiscally dependent cities with necessary aid, resulting in the delivery of an inadequate education. Then he noted,
 

 “it could not be said as a matter of law that the picture painted by this proof of disparities and discriminations complied with even the undefined ‘minimal acceptable facilities and services’ or the broadly stated ‘sound basic education’ * * *. The fact is, of course, that in this past century, as high school and college statistics show, the acceptable level of education in our country has risen, not fallen.
 

 “Responsively, the constitutional demands of our State’s education article, must be deemed to have kept pace. * * * And, as great expounders of constitutional law, from Marshall to Holmes, have always made clear, such a document’s permanence rests on its adaptability to changing events (Jackson, Struggle for Judicial Supremacy, p 174)”
 
 (id.
 
 at 57).
 

 Finally, Judge Fuchsberg agreed with the Appellate Division’s application of an intermediate scrutiny standard to the state equal protection claim under which standard the funding scheme could not remain.
 

 In 1994, plaintiffs in
 
 Campaign for Fiscal Equity
 
 (86 NY2d 307 [1995]) commenced another action, decided today, arguing
 
 *451
 
 that the public school financing scheme violated the Education Article, the Equal Protection Clauses of the State and Federal Constitutions, and the implementing regulations to title VI (34 CFR 100.3 [b] [2]). We first distinguished
 
 Levittown
 
 by noting, “The Court there manifestly left room for a conclusion that a system which failed to provide for a sound basic education would violate the Education Article”
 
 (id.
 
 at 316). We then found that a sound basic education “should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury”
 
 (id.)
 

 Paraphrasing from
 
 Levittown,
 
 we stated, “If the physical facilities and pedagogical services and resources made available under the present system are adequate to provide children with the opportunity to obtain these essential skills, the State will have satisfied its constitutional obligation”
 
 (id.).
 
 We then outlined a nonexclusive list of resources children need to obtain a sound basic education. We concluded that plaintiffs pleaded a proper cause of action under the Education Article because “Making as true the allegations in the complaint, as we must, plaintiffs allege and specify gross educational inadequacies that, if proven, could support a conclusion that the State’s public school financing system effectively fails to provide for a minimally adequate educational opportunity” (86 NY2d at 319).
 

 We dismissed the equal protection claims under the State and Federal Constitutions. However, we sustained the claim under the implementing regulations to title VI.
 

 The concurring opinion of Judge Levine agreed that this Court had a responsibility to determine the meaning of a sound basic education. Relying on the words of a legislator during the Constitutional Convention debates, Judge Levine concluded that the objective of the Education Article was “to ‘make[ ] it
 
 imperative
 
 on the State to provide
 
 adequate
 
 free common schools for the education of
 
 all
 
 of the children of the State’ and that the new provision would have an impact upon ‘places in the State of New York where the common schools are not adequate’ (3 Revised Record of Constitutional Convention of 1894, at 695 [emphasis supplied])” (86 NY2d at 327). Nevertheless, Judge Levine did not agree with the key interpretation of a sound basic education as requiring skills necessary to become a productive citizen. Rather, he believed that, under
 
 Levittown,
 
 a system of sound basic education did not violate the Education Article if it provided basic reading and writing and computational skills, and citizenship awareness. Unlike the
 
 *452
 
 majority’s standard, this standard would not invite and entail “subjective, unverifiable educational policy making by Judges, unreviewable on any principled basis, which was anathema to the
 
 Levittown
 
 Court” (86 NY2d at 332).
 

 Judge Simons, on the other hand, in his dissent in
 
 CFE I,
 
 concluded that plaintiffs had not successfully pleaded a cause of action under the Education Article. After reviewing the constitutional history of the Education Article, Judge Simons noted, “I find no indication that the drafters intended to * * * impose a qualitative component within the Education Article, or to hold the State liable to make up a shortage of funds in particular school districts” (86 NY2d at 335). In Judge Simons’ view, it was up to the State to determine the meaning of a sound basic education, and this Court should not review an action under the Education Article unless a “ ‘gross and glaring inadequacy’ in State funding” was alleged (86 NY2d at 340). Judge Simons, and to an extent Judge Levine, and now Judge Read believe that issues of funding and quality of education should be settled by the political process and that this Court should refrain from participating.
 
 [2]
 
 It is certainly the case that in our system of government, the three branches are separated by walls. The walls, however, are not solid.
 
 [3]
 
 Rather, the concept of checks and balances gives to this Court the responsibility of interpreting the Constitution, even if that interpretation reaches into spheres which are normally the province of the two other branches. The reach may be limited to pronouncing the minimum that the Education Article requires. It does not
 
 *453
 
 constitute a takeover of the Legislature’s responsibility to determine educational policy and funding.
 
 [4]
 

 The conclusion of this Court that the State is required to provide children in the twenty-first century with the opportunity to obtain a sound basic education is consistent with the spirit of the Education Article, which represents the culmination of a long fought struggle to ensure that all the children of New York, not just the children of the wealthy, would have access to a sound education. This case is a continuation of that struggle as is evident from a brief history.
 

 Origins of New York Public Schools
 

 Initially, the struggle centered on persuading the Legislature to establish common schools. Although a form of public education was prevalent when the Dutch West India Company controlled New Amsterdam, the southern tip of Manhattan, public
 
 *454
 
 schools were not a priority of the British authorities who assumed dominion in 1664 (3 Lincoln, The Constitutional History of New York, at 476-487 [1905]). The General Assembly enacted two laws relating to public schools. In 1702 an act was passed for the “encouragement of a grammar free school in the city of New York,” which was not renewed when it expired in 1707. (Finegan, A Documentary History of the Free School Movement in New York State, at 22 [1921].) In 1732, another law was enacted “to encourage a public school in the city of New York for teaching Latin, Greek and Mathematics.”
 
 (Id.)
 
 Only a few students were able to attend the school.
 
 (Id.)
 

 According to one writer, the “one bright spot in the intellectual gloom of the century of English domination” was the founding of King’s College, now Columbia University, in 1754 (Department of Public Instruction, The Schools of New York. A Glance at the Common School System of the Empire State, at 20 [1893] [hereinafter Schools of New York]). Notably, the British issued the royal charter that founded the college based on the urging of the Governor that such an institution was necessary “to prevent the growth of republican principles which already too much prevail in the colonies”
 
 (id.
 
 at 21). On the contrary, Columbia educated such men as Alexander Hamilton, Robert Livingston, John Jay, DeWitt Clinton, and Gouverneur Morris.
 

 After the Revolution in 1776, the early public schools were too impoverished to offer anything more than a crude education to the poor children of the state. The State neither funded nor regulated public schools. In the cities, the schools where located in areas “where the best families would not be disturbed by the sight of the uncouth garb and uncultivated noise of free-school children”
 
 (id.
 
 at 23). In dilapidated schools, the children were taught only “spelling, reading, writing and common arithmetic” with the barest of instrumentalities by teachers who possessed little education
 
 (id.
 
 at 26). The children of the wealthy, on the other hand, learned comfortably and well in private academies and nurseries.
 

 The first Constitution of 1777 omitted any mention of education. Lincoln blames the omission on the hasty actions of a marginal number of the total delegates at Kingston who adopted the Constitution despite the absence of several prominent members, and declined to consider additional topics that many thought should have been included (3 Lincoln, at 487). A letter from John Jay, one of the absentees, to Gouverneur Morris and Mr. Livingston, stated that he would
 
 *455
 
 have been in favor of a clause for “the support and encouragement of literature”
 
 (id.
 
 at 488).
 

 In 1784, the Legislature enacted a law incorporating the Regents of the University of the State of New York as the board of trustees of Columbia, to organize other institutions of higher education, and to charter private academies, then the term for high schools
 
 (see, LaValle v Hayden,
 
 98 NY2d 155, 158-159 [2002]). The Regents soon realized that the benefits of an education should be available to the masses. In a 1793 annual report, they stated:
 

 “On this occasion we cannot help suggesting to the legislature the numerous advantages which we conceive would accrue to the citizens in general from the institution of schools in various parts of the state for the purpose of instructing our children in the lower branches of education; such as reading their native language with propriety, and so much of writing and arithmetic as to enable them, when they come forward in active life, to transact with accuracy and despatch the business arising from their daily intercourse with each other” (3 Lincoln, at 502-503).
 

 Two years later, Governor George Clinton embraced the goal of public schooling and made it his foremost ambition. Recognizing that the “[n]eglect of the education of youth is one of the evils consequent upon war,” Governor Clinton made the following speech when the Legislature of 1795 convened for the first time after the adoption of the Constitution:
 

 “While it is evident that the general establishment and liberal endowment of academies are to be highly commended, and are attended with the most beneficial consequences, yet it can not be denied that they are principally confined to the children of the opulent, and that a great portion of the community is excluded from their immediate advantages. The establishment of common schools throughout the State is happily calculated to remedy this inconvenience, and will, therefore, engage your early and decided consideration” (Schools of New York, at 28).
 

 That same year, the Legislature enacted a law (L 1795, ch 75) appropriating $50,000 annually for five years “for the purpose of encouraging and maintaining schools in the several
 
 *456
 
 cities and towns in this state, in which the children of the inhabitants residing in the state, shall be instructed in the English language, or be taught English grammar, arithmetic, mathematics, and such other branches of knowledge as are most useful and necessary to complete a good English education” (quoted in Randall, The Common School System of the State of New York, at 6 [1851] [prepared in pursuance of an act of the Legislature]; 3 Lincoln, at 526-527).
 

 Initially, the sum appropriated was distributed to the several counties according to representation in the Legislature, and later according to their representation in the Assembly. In the towns, the share received hinged on the number of taxable inhabitants. In addition, each town was required to raise one half of the amount it received from the State. The electors of each town and county were responsible for “procuring good and sufficient schoolmasters, and for the erecting and maintaining schools” (quoted in Randall, at 6). The electors appointed trustees responsible for running the schools, and commissioners responsible for running the school districts. The commissioners would distribute the public money allocated by the State according to the number of days of instruction.
 

 In 1800, the law expired and was not renewed despite Governor John Jay’s supplications. During the next 11 years, the Legislature failed to respond to the supplications of Governor Clinton and then Governor Morgan Lewis. The Legislature did enact several laws establishing funds to be used for the support of common schools.
 

 In 1812, the Legislature enacted, with minor modifications, a bill submitted by a commission it established to report on a system for the establishment of common schools
 
 (see Judd v Board of Educ.,
 
 278 NY 200, 205-206 [1938]). The members were appointed by Governor Tompkins who had continued his predecessors’ exhortations in support for common schools (3 Lincoln, at 507-508; Randall, at 8-9). In their report the commissioners concluded as follows:
 

 “Perhaps there never will be presented to the legislature a subject of more importance than the establishment of common schools. Education, as the means of improving the moral and intellectual faculties, is, under all circumstances, a subject of the most imposing consideration. * * *
 

 “[I]n a government like ours, where the people is
 
 *457
 
 the sovereign power; where the will of the people is the law of the land; which is openly and directly expressed; and where every act of the government may justly be called the act of the people; it is absolutely essential that that people be enlightened. They must possess both intelligence and virtue: intelligence to perceive what is right, and virtue to do what is right. Our republic, therefore, may justly be said to be founded on the intelligence and virtue of the people. * * *
 

 “As the people must receive the advantages of education, the inquiry naturally arises, how this end is to be attained. The expedient devised by the legislature, is the establishment of common schools; which being spread throughout the state and aided by its bounty, will bring improvement within the reach and power of the humblest citizen. * * *
 

 “In these schools should be taught, at least, those branches of education which are indispensably necessary to every person in his intercourse with the world, and to the performance of his duty as a useful citizen. Reading, writing, arithmetic, and the principles of morality, are essential to every person, however humble his situation in life. * * * A person provided with these acquisitions, is enabled to pass through the world respectably and successfully” (Randall, at 9-11).
 

 The Common School Act of 1812 (L 1812, ch 242) created a State Superintendent of Common Schools, appointed by the Council of Appointment. The Act continued the framework of its predecessor: towns were divided into school districts and citizens qualified to vote elected trustees and commissioners. State funds were distributed to towns according to population. Within the towns, funds were distributed based on the number of children between the ages of 5 and 15 in each school district. Each town was required to raise an amount equal to their allocation. Teachers had to be examined and licensed by the trustees (3 Lincoln, at 508; Randall, at 11).
 

 The Act of 1812 differed in two important respects from the law of 1795. First, it provided that parents, excepting the indigent, were required to contribute to the salary of teachers whenever the state funds and local funds were insufficient (Finegan, at 36). This was known as the rate bill. Second, the
 
 *458
 
 Act did not apply to New York City, where the Free School Society of the City of New York ran schools that did not require any contribution. The Free School Society was founded in 1805, with DeWitt Clinton as its first president (Schools of New York, at 41).
 

 Gideon Hawley, the founder of what is now the State University of New York at Albany, served as the first Superintendent until 1821 when the office was abolished and its duties transferred to the Secretary of State who served ex officio as Superintendent of Common Schools (Randall, at 18). The year 1821 was also the year of the second Constitutional Convention, which established a perpetual fund consisting of proceeds, with certain exceptions, from the sale of state land to be used for the support of common schools
 
 {id.
 
 at 19). Five years later, in 1826, Governor DeWitt Clinton, in his address to the Legislature, discussed the importance of qualified teachers and school visitors:
 

 “The first duty of government, and the surest evidence of good government, is the encouragement of education * * * Our common schools embrace children from five to fifteen years old and continue to increase and prosper. * * *
 

 “In two years the elements of instruction may be acquired, and the remaining eight years must either be spent in repetition or in idleness, unless the teachers of common schools are competent to instruct in the higher branches of knowledge. The outlines of geography, algebra, mineralogy, agricultural chemistry, mechanical philosophy, surveying, geometry, astronomy, political economy and ethics, might be communicated in that period of time by able preceptors * * * The vocation of a teacher, in its influence on the character and destinies of the rising and all future generations, has either not been fully understood or duly estimated. It is, or ought to be, ranked among the learned professions * * * I therefore recommend a
 
 seminary for the education of teachers
 
 * * * A compliance with this recommendation will have the most benign influence on individual happiness and social prosperity.
 

 To break down the barriers which poverty has erected against the acquisition and dispensation of knowledge, is to restore the just equilibrium of society * * *
 

 
 *459
 
 “I consider the system of our common schools as the palladium of our freedom * * * A visitorial authority [bestowed upon the Secretary of State] for the purpose of detecting abuses in the application of the funds, of examining into the modes and plans of instruction, and of suggesting improvements, would unquestionably be attended with the most propitious effects”
 
 (id.
 
 at 23-24).
 

 The next year, Governor Clinton reiterated his earlier message and so did the Senate’s literature committee, which noted:
 

 “In vain will you have established a system of instruction, in vain will you appropriate money to educate the children of the poor, if you do not provide persons competent to execute your system, and to teach the pupils collected in the schools * * * [T]he incompetency of the great mass of teachers is a radical defect, which impedes the whole system, frustrates the benevolent designs of the legislature, and defeats the hopes and wishes of all who feel an interest in disseminating the blessings of education * * *
 

 “Having undertaken a system of public instruction, it is the solemn duty of the legislature to make that system as perfect as possible.”
 
 (Id.
 
 at 28-29.)
 

 By 1834, the Legislature had firmly established the policy that the Regents were responsible for supervising the instruction of common school teachers (3 Lincoln, at 515). The same year the Legislature enacted a law allowing the superintendent to appoint a county board of visitors. In 1844, the Legislature, by chapter 311 of the Laws of 1844, established a normal school at Albany to be supervised and controlled jointly by the Regents and the State Superintendent (Randall, at 55-56).
 

 Free School Movement
 

 A significant force instigating the establishment and improvement of common schools was the free school movement. The name of the movement derives from the fact that the many common schools at the time were not entirely free because of the existence of the rate bill. Although poor families were exempted, the rate bill often had the effect of keeping thousands of children away from the common schools. Many parents were unwilling to be publicly adjudged indigent or too willing to
 
 *460
 
 overlook their children’s truancy (Finegan, at 543). Those who supported the establishment and support of free public schools were often referred to as “the friends of education.”
 

 Students in New York City were not subject to the rate bill even after 1842 when the Legislature established public schools in the City under the general supervision of a board of education, in response to objections from Catholics to the Protestant leanings of the existing public schools (L 1842, ch 150). Free public schools were eventually established in the other large cities of the state, leaving the rate bill intact in other parts of the state.
 

 At the Constitutional Convention of 1846, the following provision was initially adopted by a close vote: “The legislature shall provide for the free education and instruction of every child of the state in the common schools now established, or which shall hereafter be established.” (3 Lincoln, at 528.)
 
 [5]
 
 It was intended that the provision would also be submitted to the people for their approval. The next day, however, the provision was defeated for reasons that are not known
 
 (id.
 
 at 528). The friends of education pressed on, sending petitions to the Legislature. In his 1847 annual report, Superintendent Nathaniel Benton noted:
 

 “The extension of free schools in the state is progressing moderately; and laws are passed nearly every session of the Legislature, providing for their establishment in populous and wealthy villages [including New York City, Buffalo, Rochester, and the Village of Poughkeepsie]; while the poorer and less populous districts, in the same towns, are left to struggle on, from year to year, in the best way they can — sustaining a school perhaps only four months in the year, to secure the next apportionment of the public moneys. Is this policy just? — is it right to discriminate in this manner, between
 
 *461
 
 the school children of the state? Why should ample provision be made for the children residing in particular localities, and others turned over to the naked bounties of the state; which, although munificent in the aggregate, are only sufficient to pay a few weeks tuition for each child?” (Randall, at 67.)
 

 Two years later, in 1849, after receiving numerous petitions, the Legislature enacted an “Act Establishing free schools throughout the state,” providing that “[c]ommon schools in the several school districts in this state shall be free to all persons residing in the district, over five, and under twenty-one years of age” (L 1849, ch 140, § 1). The act applied to all of the public schools, including New York City. Boards of supervisors were required to tax each county and town the same amount of money each was entitled to receive from the State, which was based on population.
 

 School districts were given the authority to present the voters an estimate of certain expenses, and if approved by the voters, levy the approved amount by a property tax (Randall, at 74). The law was made contingent on approval by the voters, and later it was approved by a vote of 249,872 to 91,951. Despite its high margin of approval, the law did not prove popular. According to the 1851 report of Superintendent Christopher Morgan, the boards of supervisors failed to make the necessary appropriations, leaving the school districts to raise the necessary funds. Moreover,
 

 “[inequalities in the valuations of taxable property contributed, in many localities, greatly to aggravate this burden, and a spirit of opposition to the new law, inflamed by its determined opponents, manifested itself at the primary district meetings, and too often resulted in the entire rejection of the estimates prepared by the trustees * * * Appeals were assiduously made to the cupidity of the heavy tax-payers — their interests sought to be arrayed against that of their less favored brethren, and against the interests of their children * * *” (Randall, at 80).
 

 In arguing for a more practical law rather than the elimination of the free school system, the Superintendent addressed the primary argument against free schools: why should certain taxpayers contribute to the education of other people’s children. Echoing the arguments of Horace Mann and other friends of
 
 *462
 
 education, Superintendent Morgan argued in his 1851 annual report to the Legislature:
 

 “Educate every child, ‘to the top of his faculties,’ and you not only secure the community against the depredations of the ignorant and the criminal, but you bestow upon it, instead, productive artisans, good citizens, upright jurors and magistrates, enlightened statesmen, scientific discoverers and inventors, and the dispensers of a pervading influence in favor of honesty, virtue and true goodness. Educate every child physically, morally and intellectually, from the age of four to twenty-one, and many of your prisons, penitentiaries and almshouses will be converted into schools of industry and temples of science, and the immense amount now contributed for their maintenance and support will be diverted into far more profitable channels * * *
 

 “If facts are required to illustrate the connection between ignorance and crime, let the official return of convictions in the several courts of the State for the last ten years be examined, and their instructive lessons be heeded. Out of nearly 28,000 persons convicted of crime, but 128 had enjoyed the benefits óf a
 
 good
 
 common school education; 414 only had what the returning officers characterize as a ‘tolerable’ share of learning; and the residue, about one-half only could either read or write.”
 
 (Id.
 
 at 83.)
 

 The same year, the Legislature repealed the law, re-enacting the provision quoted.
 
 [6]
 
 The new act provided for an annual tax of $800,000, one third of which and all other funds would be distributed equally among the districts, and the rest distributed according to the number of children between the ages of 5 and 21. In addition, any other expenses would be provided by a rate bill exempting indigent persons (Randall, at 85).
 

 In 1853, the Legislature enacted the Union Free School Act (L 1853, ch 433) which allowed the inclusion of secondary education within common schools, heretofore limited to primary education. Two or more school districts could merge and create an academy, then the term for high school, under the
 
 *463
 
 immediate supervision of a board of education. The Superintendent retained general supervision over the common schools, while the Regents were in charge of supervising and regulating admissions requirements of the high schools.
 

 In his 1855 message, Governor Myron Clark, noting that “[a]mong the subjects which will require your attention there is none of more importance than the system of public education of the State,” urged the Legislature to improve the system by eliminating the rate bill, and creating more high schools. (Finegan, at 528.) In regards to the latter, he noted that in New York City,
 

 “[a] free academy has been added to the system, in which a large and competent corps of professors and tutors has been provided, a plan of study extending over five years and embracing all the branches of study pursued in the best colleges of the country has been adopted, scientific apparatus, libraries, and all the aids requisite for study have been furnished, and the general discipline and course of instruction have been made in all respects of the highest and most efficient character. * * * While I am aware that large cities afford facilities for such a system, which cannot be fully enjoyed in the rural districts, I think that something may be done throughout the State in this direction. A voluntary beginning, indeed, has already been made in some sections, by the establishment of union schools; and their success shows that the system is not wholly impracticable”
 
 (id.
 
 at 530).
 

 In 1867, after years of arduous and vigorous lobbying from the friends of education, the Legislature eliminated the rate bill by chapter 406 of the Laws of 1867, thus allowing all students in the state to attend school for free without any out-of-pocket contributions (3 Lincoln, at 530). A year later, Governor Reuben Eaton Fenton noted that the elimination of the rate bill was “producing a very large increase in the aggregate number of pupils at the schools, and greater regularity in their attendance.”
 
 (Id.
 
 at 531.)
 

 The Constitutional Convention that took place in 1867 adopted the following provision: “The legislature shall provide for the free instruction in the common schools of this state, of all persons between seven and twenty years of age.” The spokesman for the education committee stated as follows:
 

 
 *464
 
 “[I]f there is any thing that should be constitutionalized because of its great importance, it is the all-important, overriding interest of education. Sir, I regard it as being paramount to every other interest in this State. I regard this article as being more important to the people of the State, to every man, woman and child in the State than any other article that has been under consideration in this Convention” (4 Proceedings and Debates of 1867-1868 NY Constitutional Convention, at 2856).
 

 Because of an unrelated political controversy, the Convention disbanded without any amendment to the Constitution.
 

 At the next Constitutional Convention in 1894, the committee on education drafted the clause that became section 1 of the Education Article: “The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this State may be educated.” (2 Documents of 1894 NY Constitutional Convention No. 62, at 1.) As to the reason for constitutionalizing the duty of the State to establish and maintain a system of free common schools, the committee on education stated as follows:
 

 “It may be urged that no imagination can picture this State refusing to provide education for its children, and for this reason the declaration which your committee have reported in section one might, no doubt, be omitted without endangering the stability of our present system of education. But the same reasoning would apply to many other matters though fundamental * * *”
 
 (id.
 
 at 3).
 

 In a comment that, in part, explains the brevity of the section, the committee stated, “No desire to confine the new Constitution to the narrowest possible limits of space should prevent the adoption of an enactment declaring in the strongest possible terms the interest of the State in its common schools.”
 
 (Id.
 
 at 4.) In regards to the purpose of ensuring that the children of the state have the opportunity to obtain a free education in the state’s common schools, the committee stated:
 

 “Whatever may have been their value heretofore, and language has been strained to the utmost in applying to them terms of praise, their importance for the future cannot be overestimated. The public problems confronting the rising generation will demand accurate knowledge and the highest devel
 
 *465
 
 opment of reasoning power more than ever before, and in view of the State’s policy as to higher education, to which reference will presently be made, too much attention cannot be called to the fact that the highest leadership is impossible without intelligent following, and that the foundation of our educational system must be permanent, broad and firm, if the superstructure is to be of real value”
 
 (id.).
 

 The words of the committee echo the words of those who supported free public education, beginning with Governor George Clinton.
 

 Present Litigation
 

 As stated in plaintiffs’ brief, their complaint alleges the following:
 

 “(1) RCSD students receive a shockingly inadequate education, as measured by all academic standards;
 

 “(2) RCSD schools have an overwhelmingly high level of poverty concentration and racial isolation;
 

 “(3) The excessively high concentration of poverty found in RCSD schools is a direct and primary cause of the subpar education received by RCSD students;
 

 “(4) The state defendants are aware, and have consistently acknowledged, that poverty concentration is a direct and primary cause of inadequate education;
 

 “(5) Laws and rules created and enforced by the state defendants have created and perpetuated the concentration of poverty; and
 

 “(6) The state defendants have failed to take the steps that are necessary to prevent, reduce and/or eliminate poverty concentration so as to provide RCSD students with an opportunity to obtain a sound basic education.”
 

 Plaintiffs rely on expert testimony and state documents to support these allegations.
 

 Interpreting the allegations liberally and giving them the benefit of all favorable inferences
 
 (CFE
 
 /, 86 NY2d at 317), as we must, plaintiffs have properly pleaded a cause of action under the Education Article. Specifically, plaintiffs’ allegations
 
 *466
 
 support the claim that in light of the state’s history of segregation, providing a sound education in a school district with a high concentration of poor and minorities requires more than the minimal funds the State has provided. Plaintiffs cite to a 1998 SED report stating schools in districts such as Rochester
 

 “by and large, are schools faced with the challenge of educating large numbers of children placed at risk by poverty * * * Throughout this report, in fact, we document a dismaying alignment of disadvantaged children (disproportionately children of color), schools with the poorest educational resources (fiscal and human), and substandard achievement.”
 

 It cannot be overlooked that there is a correlation between plaintiffs’ claim that a high concentration of poor and minority students denies an opportunity for a sound education and the fact that the funds available to their district are primarily based on property taxes.
 

 Like the plaintiffs in
 
 CFE I,
 
 plaintiffs argue that they are being deprived of the opportunity to obtain the skills necessary to become productive citizens capable of voting and serving on a jury. The plaintiffs in
 
 CFE I
 
 presumably believed that the opportunity for a sound education would be available in New York City if schools were provided with adequate teachers, updated books and so forth. New York City is a very diverse city in every sense of the word. Although many of New York City’s approximately 1.1 million public school students are poor, it was clearly the expectation of the plaintiffs in
 
 CFE I,
 
 that if the schools were provided with essential services such as certified teachers, the schools would become more class balanced, increasing the chances that the schools would provide a sound basic education.
 

 That expectation is less likely in the relatively small City of Rochester where nearly 60% of the households are low-income. In addition, all but 100 of the 2,494 units of public housing in Monroe County are located in the City of Rochester.
 

 Plaintiffs should be given the opportunity to establish that in light of the history of segregation, and the high concentration of poor and minority students, the resources made available under the State’s financing system are inadequate to provide them with the opportunity to obtain the skills necessary to enable them to function productively as civic participants capable of voting and serving on a jury. Plaintiffs should be able to show that in the City of Rochester, additional resources are needed.
 

 
 *467
 
 While the clear emphasis of the allegations of the complaint is on the racial and poverty aspects of the Rochester schools, this record does not indicate that the resources of the Rochester school district are adequate. In fact, the record shows the opposite. The outcomes alleged in the complaint are indications that the resources are inadequate.
 
 [7]
 
 As in
 
 CFE I,
 
 plaintiffs would have to prove that there is a link between the outcomes and the action or inaction of the State and that if the State provides sufficient funds, they would have access to the resources that would allow the schools to provide a sound basic education.
 

 Even interpreting plaintiffs’ allegations narrowly, as the majority does following the footsteps of the lower courts, plaintiffs have properly pleaded a cause of action under the Education Article. Under this view, plaintiffs are unconcerned with adequate funding. It is worth noting, however, that although plaintiffs focus on the concentration of poor and minority students, they do not claim that funding does not matter. Even if, as the majority states, the allegations of the present complaint are inadequate, plaintiffs should be given an opportunity to replead their causes of action.
 

 In any event, we should not be satisfied that lack of funding, the only alleged culprit in
 
 Levittown
 
 and
 
 CFE I,
 
 is the one and only possible reason for the State’s failure to provide the op
 
 *468
 
 portunity of a sound education. To be sure, there is language in
 
 Levittown
 
 that supports the view that the State’s only responsibility is to ensure that a system of education is funded, but that was not the holding of the case (57 NY2d at 48). The holding with respect to the Education Article was that it does not mandate that educational opportunities be equal throughout the state.
 

 The State has the responsibility to maintain and support a system in which students have access to a sound education. If students lack access to a sound basic education because of a high number of uncertified teachers, then it is the State’s responsibility to remedy that problem. If the concentration of poor and minority students, assuming it is true, will necessarily result in schools that do not offer the opportunity of a sound basic education, even with adequate funding, then the State should remedy that problem. It may very well be the case, as the Appellate Division stated, that “[t]here are myriad reasons for academic failure that are beyond the control of the State.” (290 AD2d at 101.) The majority suggests “lack of family supports and health care” as possible causes of academic failure (majority op at 441). It is not plaintiffs’ contention, however, that the State should provide free health care outside of the school setting or resources intended to forge family ties. Such remedies would indeed be beyond the scope of this Court’s powers in this action. The Education Article does not require that the State ensure that families understand the importance of an education, or for that matter ensure that parents are active participants in the education of their children. But this is a red herring. It is the official policy of the Regents, and thus of the State, since the former is a creature of the latter, that all children can learn
 
 (see United States v Yonkers Bd. of Educ.,
 
 123 F Supp 2d 694, 701 n 11 [SD NY 2000]). A child who lives in a high crime neighborhood with one parent struggling to make ends meet is capable of learning. It is plaintiffs’ contention that when a school population is made up almost entirely of such children, the opportunity to learn vanishes. In essence, the argument is that schools that are racially and socially segregated do not provide the opportunity for a sound basic education even if the funding may be adequate. The alleged cause of the problem, the high concentration of poor and minority students, is not one that is beyond the powers of the State to remedy.
 

 The Constitution does not place the responsibility of providing a sound education on local school districts, or towns, or
 
 *469
 
 cities. It places that responsibility squarely on the State. The purpose of the Education Article was to constitutionalize the State’s responsibility to ensure that students would have access to a sound education. If students cannot depend on the State for the opportunity of a sound education, the alternative is to attend schools that do not offer the opportunity for a sound education and to face the significant likelihood of becoming unproductive citizens.
 

 Plaintiffs reject the argument that they should simply petition the Legislature for redress, responding that the Legislature has consistently turned its back on them despite a thorough familiarity with their plight. In addition, they argue, the Legislature at one point pursued policies to perpetuate their segregation, which still reverberate today. More importantly, plaintiffs contend that it is this Court’s duty to say what the law is, to determine if there is a legal right, and if so, to provide a remedy
 
 (see Marbury v Madison,
 
 1 Cranch [5 US] 137, 162-163 [1803]).
 

 The conditions alleged by the plaintiffs would have alarmed the framers of the Education Article, who were duly concerned with the education of the poor. In responding to those who criticized the existence of school districts with high schools, they quoted from the following words of Superintendent Kennedy:
 

 “If the opponents of high schools could carry their point we should soon have class education in its most vicious form. The wealthy classes would simply send their children to private high schools, and the progressive deterioration of the lower grades, unsupported by a high school center, would cause them to withdraw their children entirely from those grades. Those grades would thus be abandoned to the poorer classes, and attendance in them would become a badge of indigence. When the public school degenerates into a mere charity school the proudest of the poor will save their self-respect by keeping out of it. The public school then would be merely an assembly of paupers. As the genius of ■ the American people have contrived it, it is the West Point of civil life, it is the people’s training house for on-coming citizenship” (2 Documents of 1894 NY Constitutional Convention No. 62, at 8).
 

 There is no merit to the argument that allowing plaintiffs’ suit to go forward is inconsistent with local control of education.
 
 *470
 
 First of all, as it stands now, the State’s control over
 
 its
 
 public schools through laws and regulations is pervasive. Second, plaintiffs are not arguing for the elimination of local school boards. They argue that the State should not draw district lines in a manner that encircles poor and minority students, and sets them up for failure. There is nothing sacrosanct about district lines. In 1894, there were 11,000 school districts. By the time of
 
 Levittown,
 
 there were 700 (57 NY2d at 44, 47). It cannot be said that the centralization that has occurred, and that may continue to occur, violates the Education Article. Moreover, local control has always taken a backseat to larger state interests
 
 (see
 
 Griffey, The History of Local School Control in the State of New York [1936]). Here, the larger interest is the need to insure that plaintiffs have access to a sound education.
 

 It should not be assumed, at this early stage of this litigation, that if plaintiffs were successful, the only remedy would entail the forced busing of students. As a model of a successful public high school, plaintiffs point to the Wilson Magnet High School located in the City of Rochester. According to plaintiffs, the school was identified as one of the top 100 public schools in the country. Plaintiffs also cite the Benjamin Franklin High School whose Latin team won 52 state-wide level awards at the New York State Classical League Convention and Latin Competition. While the Education Article certainly does not require that every high school perform as well as these schools, they show that with sufficient efforts, as required by the Education Article, all the children in the City of Rochester would have the opportunity to attend schools that at a minimum provide a sound education.
 

 In sum, I would permit the plaintiffs to attempt to prove their case under the Education Article, or give the plaintiffs an opportunity to replead their cause of action.
 

 Judges Ciparick, Rosenblatt and Graffeo concur with Chief Judge Kaye; Judge Read concurs in result only; Judge Smith dissents in a separate opinion.
 

 Order affirmed, without costs.
 

 Appendix to Dissenting Opinion
 

 See Serrano v Priest,
 
 18 Cal 3d 728, 766, 557 P2d 929, 951 (1976) (“education is a fundamental interest”);
 
 Horton v Meskill,
 
 172 Conn 615, 648-649, 376 A2d 359, 374 (1977) (“without doubt the trial court correctly held that, in Connecti
 
 *471
 
 cut, elementary and secondary education is a fundamental right, that pupils in the public schools are entitled to the equal enjoyment of that right, and that the state system of financing public elementary and secondary education as it presently exists and operates cannot pass the test of ‘strict judicial scrutiny’ as to its constitutionality”);
 
 Seattle School Dist. No. 1 of King County v State,
 
 90 Wash 2d 476, 496, 517, 585 P2d 71, 83-84, 94 (1978) (finding that court had a duty to interpret the Education Article “even when that interpretation serves as a check on the activities of another branch or is contrary to the view of the constitution taken by another branch * * * [T]he State’s constitutional duty goes beyond mere reading, writing and arithmetic. It also embraces broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today’s market as well as in the market place of ideas”);
 
 Pauley v Kelly,
 
 162 W Va 672, 705-707, 255 SE2d 859, 877-878 (1979) (“We may now define a thorough and efficient system of schools: It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically. * * * Because education is a fundamental constitutional right in this State, then, under our equal protection guarantees any discriminatory classification found in the educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification”);
 
 Rose v Council for Better Educ., Inc.,
 
 790 SW2d 186, 209, 211, 212 (Ky 1989) (“The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it *
 
 * *
 
 This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court’s view of the constitution is contrary to that of other branches, or even that of the public. * * * [T]he children who live in the poor districts and the children who live in the rich districts must be given the same opportunity and access to an adequate education,” defined as one which has as its goal the development of seven minimum capacities, including “[i] sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; * * * [vii] sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding
 
 *472
 
 states, in academics or in the job market”);
 
 Edgewood Ind. School Dist. v Kirby,
 
 777 SW2d 391, 394-397 (Tex 1989) (“If the system is not ‘efficient’ or not ‘suitable,’ the legislature has not discharged its constitutional duty and it is
 
 our
 
 duty to say so. * * * Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds”);
 
 Abbott by Abbott v Burke,
 
 119 NJ 287, 384-385, 575 A2d 359, 384-385 (1990) (“students in poorer urban districts have not been able to participate fully as citizens and workers in our society. They have not been able to achieve any level of equality in that society with their peers from the affluent suburban districts. * * * We find that in order to provide a thorough and efficient education in these poorer urban districts, the State must assure that their educational expenditures per pupil are substantially equivalent to those of the more affluent suburban districts, and that, in addition, their special disadvantages must be addressed”);
 
 McDuffy v Secretary of Exec. Off. of Educ.,
 
 415 Mass 545, 606, 615 NE2d 516, 548 (1993) (“the Commonwealth has a duty to provide an education for
 
 all
 
 its children, rich and poor, in every city and town of the Commonwealth at the public school level, and * * * this duty is designed not only to serve the interests of the children, but, more fundamentally, to prepare them to participate as free citizens of a free State to meet the needs and interests of a republican government, namely the Commonwealth of Massachusetts. This duty lies squarely on the executive [magistrates] and legislative [Legislatures] branches of this Commonwealth. That local control and fiscal support has been placed in greater or lesser measure through our history on local governments does not dilute the validity of this conclusion”);
 
 Tennessee Small School Sys. v McWherter,
 
 851 SW2d 139, 155 (Tenn 1993) (discussing Education Clause, but holding that financial disparities violated State Equal Protection Clause even if the right to a public education was not fundamental, because the educational system “has no rational bearing on the educational needs of the districts”);
 
 Roosevelt Elementary School Dist. No. 66 v Bishop,
 
 179 Ariz 233, 239-242, 877 P2d 806, 812-815 (1994) (“the conventioneers believed that a free society could not exist without educated participants. * * * Funding mechanisms that provide sufficient funds to educate children on substantially equal terms tend to satisfy the general and uniform requirement. School financing systems which themselves create gross disparities are not general and uniform. * * * As
 
 *473
 
 long as the statewide system provides an adequate education, and is not itself the cause of substantial disparities, local political subdivisions can go above and beyond the statewide system”);
 
 Claremont School Dist. v
 
 Governor, 138 NH 183, 192, 635 A2d 1375, 1381 (1993) (“Given the complexities of our society today, the State’s constitutional duty extends beyond mere reading, writing and arithmetic. It also includes broad educational opportunities needed in today’s society to prepare citizens for their role as participants and as potential competitors in today’s marketplace of ideas”);
 
 Helena Elementary School Dist. No. 1 v State,
 
 236 Mont 44, 55, 769 P2d 684, 690 (1989) (“We conclude that as a result of the failure to adequately fund the Foundation Program, forcing an excessive reliance on permissive and voted levies, the State has failed to provide a system of quality public education granting to each student the equality of educational opportunity guaranteed under” the State Education Article);
 
 Campbell County School Dist. v State,
 
 907 P2d 1238, 1264 (Wyo 1995) (“Constitutional provisions imposing an affirmative mandatory duty upon the legislature are judicially enforceable in protecting individual rights, such as educational rights * * * Although this court has said the judiciary will not encroach into the legislative field of policy making, as the final authority on constitutional questions the judiciary has the constitutional duty to declare unconstitutional that which transgresses the state constitution”);
 
 DeRolph v State,
 
 78 Ohio St 3d 193, 197-205, 677 NE2d 733, 737-742 (1997) (“we dismiss as unfounded any suggestion that the problems presented by this case should be left for the General Assembly to resolve * * * [E]vidence was presented to establish that the appellant school districts were starved for funds, lacked teachers, buildings, and equipment, and had inferior educational programs, and that their pupils were being deprived of educational opportunity”);
 
 Brigham v State,
 
 166 Vt 246, 268, 692 A2d 384, 397 (1997) (“Children who live in property-poor districts and children who live in property-rich districts should be afforded a substantially equal opportunity to have access to similar educational revenues.
 
 * * *
 
 [W]e hold only that to fulfill its constitutional obligation the state must ensure
 
 substantial
 
 equality of educational opportunity throughout Vermont”);
 
 Leandro v State,
 
 346 NC 336, 347, 488 SE2d 249, 255 (1997) (adopting the same minimum standard as
 
 Rose
 
 [supra]);
 
 Lake View School Dist. No. 25 of Phillips County v Huckabee,
 
 351 Ark 31, 57-59, 91 SW3d 472, 487-488 (2002) (same). Even in cases where plaintiffs have not prevailed, some
 
 *474
 
 courts have found that education is a fundamental right and others have established constitutional mínimums
 
 (Idaho Schools for Equal Educ. Opportunity v State,
 
 132 Idaho 559, 563, 565, 976 P2d 913, 917, 919 [1998] [finding that “Legislature has the duty to provide a means for school districts to fund facilities that offer a safe environment conducive to learning” and that regulations promulgated by executive branch involving
 
 “requirements for school facilities,
 
 instructional programs and textbooks, and transportation systems * * *
 
 are consistent with our view of thoroughness”]; Abbeville County School Dist. v State,
 
 335 SC 58, 515 SE2d 535 [1999];
 
 Skeen v State,
 
 505 NW2d 299, 313 [Minn 1993] [“on balance, we hold that education
 
 is
 
 a fundamental right under the state constitution, not only because of its overall importance to the state but also because of the explicit language used to describe this constitutional mandate”];
 
 Scott v Commonwealth,
 
 247 Va 379, 386, 443 SE2d 138, 142 [1994] [“we agree with the trial court that education is a fundamental right under the (State) Constitution”];
 
 Exira Community School Dist. v State,
 
 512 NW2d 787, 796 [Iowa 1994] [“a student has a due process right to an adequate education”];
 
 see also Gould v Orr,
 
 244 Neb 163, 168, 506 NW2d 349, 353 [1993] [“appellants failed to state facts sufficient to state a cause of action. Appellants’ petition * * * does not specifically allege any assertion that * * * disparity in funding is inadequate and results in inadequate schooling”];
 
 School Admin. Dist. No. 1 v Commissioner, Dept. of Educ.,
 
 659 A2d 854, 857 n 5 [Me 1995] [“we believe that challenges to the state’s
 
 financing of
 
 education beyond what is necessary to provide an adequate level of education which meets all state standards must be evaluated, not under strict scrutiny, but rather under the rational basis test, and we will not set aside the legislature’s determination unless the funding system employed somehow impinges upon the adequacy with which the state meets the fundamental right to a general and uniform education”];
 
 Vincent v Voight,
 
 236 Wis 2d 588, 599 n 2, 614 NW2d 388, 396 n 2 [2000] [“We are satisfied that the issues presented to us in this case are appropriate for decision by this court in the exercise of our constitutional role. This is an area where all three of the co-equal branches of state government share power and authority consistent with the Wisconsin Constitution”]). A few courts have agreed with the conclusion of Judge Simons and Judge Read
 
 (Ex parte James,
 
 836 So 2d 813 [Ala 2002];
 
 Marrero ex rel. Tabalas v Commonwealth,
 
 559 Pa 14, 739 A2d 110 [1999];
 
 Lewis E. v Spagnolo,
 
 186 Ill 2d 198,
 
 *475
 
 710 NE2d 798 [1999];
 
 City of Pawtucket v Sundlun,
 
 662 A2d 40 [RI 1995];
 
 Coalition for Adequacy & Fairness in School Funding, Inc. v Chiles,
 
 680 So 2d 400 [Fla 1996]).
 

 [1]
 

 . Defendants brought their motion after joining issue, and therefore moved under CPLR 3212. The motion is addressed, however, solely to the sufficiency of the pleadings and has been treated accordingly (see CPLR 3211 [a] [7]).
 

 [2]
 

 . We
 
 affirm dismissal of plaintiffs’ title VI claim for the same reasons that we reject a similar theory in
 
 CFE
 
 II (100 NY2d at 903). Plaintiffs do not pursue their equal protection claim here, so we need only consider their Education Article claim.
 

 [3]
 

 . Plaintiffs’ theory — student poverty concentration (for which the State is responsible) causes inadequate education — is fully set out by the dissent (at 465). As is clear, no matter how broadly one reads plaintiffs’ complaint, it does not allege a lack of state education resources. Accordingly, the dissent’s repeated references to “minimal” and “inadequate” funds in the RCSD (see dissent at 466, 467) are off point. Plaintiffs do not ask for more resources.
 

 [4]
 

 . Procedures for forming, altering and dissolving school districts are set forth in article 31 of the Education Law (see Education Law § 1501
 
 et
 
 seq.;
 
 cf.
 
 Education Law §§ 314, 2218), which pervasively reflects a legislative intent for voters and their local elected officials to determine school district boundaries. We are not called upon to review the wisdom or constitutionality of programs by which the State has sought, for years, to encourage voluntary interdistrict programs to remedy the problem of racial isolation in the RCSD
 
 (see Brewer v West Irondequoit Cent. School Dist.,
 
 212 F3d 738 [2d Cir 2000],
 
 superseded by rule as stated in Zervos v Verizon N.Y., Inc.,
 
 252 F3d 163, 171 n 7 [2d Cir 2001]). Further, while plaintiffs cite
 
 Brewer
 
 for the proposition that segregation has increased in the RCSD, this action is brought under the Education Article, not under the rubric of federal civil rights cases concerning segregation in the schools
 
 (see e.g. United States v City of Yonkers,
 
 96 F3d 600 [2d Cir 1996]).
 

 [1]
 

 .
 
 Lee v Nyquist,
 
 318 F Supp 710 (1970),
 
 affd
 
 402 US 935 (1971).
 

 [2]
 

 . This is not only the minority view in this Court but among the highest state courts across the country.
 
 (See
 
 Appendix.) Although the wording of the constitutional clauses varies, and some courts have based their decisions on equal protection grounds, there is a common understanding as to the nature of the courts’ role and the importance of the legislative responsibility of providing children with an adequate education. The dissent in
 
 CFE II
 
 insinuates that judicial intervention was proper in those cases because the constitutional clauses involved contained words such as “thorough and efficient.”
 
 (Campaign for Fiscal Equity v State of New York,
 
 100 NY2d 893, 948 n 1 [Read, J., dissenting].) This argument assumes that the framers of our Education Article were unconcerned with the quality of the education the Legislature would be required to provide. But we know based on the framers’ report that that assumption is incorrect. Even without the education committee’s report, it is hard to imagine that the framers would have been satisfied with an educational system that did not provide the opportunity for a sound basic education. Such a system can be said to be inefficient. It is worth noting that the constitutional clauses in many of these cases do not include the word “adequate,” just like the Education Article of this State does not include the words “sound, basic.”
 

 [3]
 

 .
 
 See
 
 James Madison, The Federalist No. 51.
 

 [4]
 

 .
 
 Directing the Legislature, or other government entities, to provide funding that satisfies minimum standards is not unprecedented. Article XVII, § 1, provides that “[t]he aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.” We have held that the Legislature may not refuse to aid “those whom it has classified as needy’
 
 (Tucker v Toia,
 
 43 NY2d 1, 8 [1977]). In
 
 Tucker,
 
 we invalidated a statute that required persons under 21 to obtain final orders of disposition in order to be eligible for home relief. The purpose of the statute was to “prevent unnecessary welfare expenditures by placing the burden of supporting persons under 21 upon their legally responsible relatives”
 
 (id.
 
 at 9). We found that the statute contravened “the letter and spirit” of article XVII, § 1, since it imposed a criterion unrelated to need
 
 (id.; see also Matter of Aliessa v Novello,
 
 96 NY2d 418 [2001] [invalidating, on the same grounds, a statute denying certain Medicaid benefits to permanent residents]. In
 
 Jiggetts v Grinker
 
 (75 NY2d 411 [1990]), we interpreted a statute enacted pursuant to section 1 of article XVIII, which required the State Commissioner of Social Services to establish “adequate” shelter allowances for recipients of public assistance under the Aid to Families with Dependent Children program. We found that the Legislature sought to impose a duty on the Commissioner to “establish shelter allowances that bear a reasonable relation to the cost of housing in New York City’
 
 (id.
 
 at 415). In
 
 Matter of Bernstein v Toia
 
 (43 NY2d 437 [1977]), however, we upheld a regulation that established flat grants for shelter allowances without taking into account exceptions due to special circumstances, since it was up to the Legislature, acting through the Commissioner, to determine the amount of aid. In
 
 McCain v Koch
 
 (70 NY2d 109 [1987]), we held that once two New York City agencies undertook to provide emergency housing to homeless families with children, they had to provide “shelter minimally habitable”
 
 (id.
 
 at 118). These cases dealt with statutes enacted pursuant to article XVII, § 1, which explicitly leaves it up to the discretion of the Legislature to determine the amount of aid to people classified as needy. An equivalent provision is not present in the Education Article.
 

 [5]
 

 . Earlier the same year, the superintendents of 40 counties held a convention to discuss “the practicability and expediency of ingrafting the free school system upon our existing organization.” (Finegan, at 101.) Horace Mann, the national spokesman for the Common School Movement, participated, giving a speech in which he told the superintendents: “If there be any such thing as innate ideas, we, in Massachusetts, are bom with an innate idea of free schools; and a citizen with us would be as much surprised, at having a rate-bill presented to him for the attendance of his children at the district school, as he would if called upon to pay for enjoying the free light of the sun, or the common air of heaven.”
 
 (Id.
 
 at 102.)
 

 [6]
 

 . The earlier law was ruled unconstitutional by this Court in 1853 for the reason that the fact of its becoming a law was made to depend upon the result of a popular vote
 
 (Barto v Himrod,
 
 8 NY 483 [1853]).
 

 [7]
 

 . The majority quotes from a paragraph of plaintiffs’ reply brief to show that plaintiffs do not allege lack of adequate resources. But plaintiffs explicitly say that they do allege inadequate educational services, even though they feel they were not required to. Plaintiffs do argue that a school in which most students are poor and minority requires greater educational resources. In their own words,
 

 “when a large percentage of a class is comprised of special education students or English-language learners, the impact on the classroom and on the resources needed is significant.
 

 “The same reasoning holds true when a large percentage of the class is comprised of poor students. The Defendants would surely not dispute that a class in which 90% of the students did not know English, or in which 90% were special education students, would call for different educational approaches and greater resources than a class containing no special education students or no English-language learners. On what basis, therefore, can Defendants argue that a classroom poverty rate of 90% has no bearing on the education available in that classroom? A class with such a high poverty rate obviously would require far different approaches and resources than a low-poverty classroom — and so the poverty concentration of a classroom is clearly an educational input affecting the delivery of education” (emphasis added).