*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered: May 5, 2016                521358
_____

NEW YORK STATE UNITED TEACHERS,
   by its President, KAREN E.
   MAGEE, et al.,
                     Appellants,
        v                                  OPINION AND ORDER

STATE OF NEW YORK et al.,
                     Respondents.
_____

Calendar Date:   January 14, 2016

Before:   McCarthy, J.P., Garry, Lynch, Devine and Clark, JJ.

————————

        Richard E. Casagrande, New York State United Teachers,
Latham, for appellants.

        Eric T. Schneiderman, Attorney General, Albany (Robert M.
Goldfarb of counsel), for respondents.

————————

Devine, J.

        Appeals (1) from an order of the Supreme Court (McGrath,
J.), entered October 3, 2014 in Albany County, which, among other
things, granted defendants' motion to dismiss the amended
complaint, and (2) from an order of said court, entered March 24,
2015 in Albany County, which, among other things, granted
defendants' motion to dismiss the second amended complaint.

        In 2011, the Legislature enacted "a comprehensive property
tax cap [to] help end the devastating impact of property taxes on
homeowners throughout New York" (Senate Introducer's Mem in
Support, Bill Jacket, L 2011, ch 97, at 16). Education Law
§ 2023-a was enacted as part of that legislation and provides

that, "[u]nless otherwise provided by law, the amount of taxes that may be levied by or on behalf of any school district, other than a city school district of a city with [125,000] inhabitants or more, shall not exceed" a tax levy limit as defined in that section (Education Law § 2023-a [1]).  The statute provides an exception where a school district proposes a budget requiring a property tax levy exceeding the limit, and that budget is subsequently approved by a supermajority of at least 60% of voters casting ballots (see Education Law §§ 2022, 2023-a [6]).

Plaintiffs commenced this action in 2013, seeking a declaration that the tax cap imposed by Education Law § 2023-a was unconstitutional.  In lieu of serving an answer, defendants moved to dismiss the first amended complaint.  The Legislature created a real property tax freeze credit while that motion was pending (see L 2014, ch 59, part FF), the purpose of which was to provide a two-year income tax credit to eligible homeowners who had paid real property taxes to school and municipal jurisdictions that abided by the property tax cap and took further steps to improve efficiency (see Education Law § 2023-b; Tax Law § 606 [bbb]).  Plaintiffs thereafter sought leave to serve a second amended complaint that, among other things, challenged the constitutionality of the tax freeze as well as the tax cap.

In an order entered in October 2014, Supreme Court dismissed the first amended complaint and granted plaintiffs leave to serve the second amended complaint.  Following service of the second amended complaint, defendants moved to dismiss it for failure to state a cause of action.  Supreme Court thereafter issued an order in March 2015 that, among other things, granted that motion.  In so doing, Supreme Court rejected defendants' contention that plaintiffs lacked standing to bring this action, but determined that their claims uniformly failed to state a cause of action.  Plaintiffs now appeal from the October 2014 and March 2015 orders.[1]

_____

[1]  Any issues relating to the dismissal of the first amended complaint are academic, as that "complaint was superseded by the [second] amended complaint" (Gotlin v City of New York, 90 AD3d

Defendants argue as an alternative ground for affirmance that plaintiffs lacked standing to bring suit. With regard to the challenges to Education Law § 2023-a, the second amended complaint alleges that the individual plaintiffs are all taxpayers and that they voted for school district budgets in 2012 requiring property tax levies that exceeded the tax levy limit, budgets that were supported by a simple majority of voters but failed to achieve the supermajority required by Education Law § 2023-a (6). Plaintiffs accordingly claim that Education Law § 2023-a has impaired their constitutional rights, including the "right to participate in the governance of their own schools," and has degraded their ability to provide school funding as they see fit (Paynter v State of New York, 100 NY2d 434, 442 [2003]). Applying the common-law standard for standing articulated in Boryszewski v Brydges (37 NY2d 361, 364 [1975]), we agree with Supreme Court that these allegations "gain [the individual plaintiffs] standing to challenge the constitutionality of" Education Law § 2023-a (Board of Educ., Shoreham-Wading Riv. Cent. School Dist. v State of New York, 111 AD2d 505, 507 [1985], lvs dismissed 66 NY2d 603, 854 [1985]; see Matter of Schulz v State of New York, 81 NY2d 336, 344-345 [1993]; compare New York State Assn. of Small City School Dists., Inc. v State of New York, 42 AD3d 648, 651 [2007] [noting that "the parents and students of individual school districts can challenge the constitutionality of their school's funding"]). The individual plaintiffs further allege that the tax freeze legislation authorized "a wrongful expenditure, misappropriation, misapplication, or . . . illegal or unconstitutional disbursement of state funds" due to its allocation of those funds for a tax credit, and such allegation affords them standing to challenge it (State Finance Law § 123-b [1]; see Schulz v Silver, 134 AD3d 1139, 1371-1372 [2015], appeal dismissed 27 NY3d 939 [2016]). Inasmuch as the individual plaintiffs have standing, we need not go further and decide whether plaintiff New York State United Teachers has organizational standing (see Saratoga County Chamber

605, 608 [2011]; see Chalasani v Neuman, 64 NY2d 879, 880 [1985]). We therefore focus our attention upon the dismissal of the second amended complaint accomplished by the March 2015 order.

of Commerce v Pataki, 100 NY2d 801, 813 [2003], cert denied 540 US 1017 [2003]).

Turning to the arguments advanced by plaintiffs, in the context of a motion to dismiss for failure to state a cause of action, "[w]e accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v Martinez, 84 NY2d 83, 87-88 [1994]; see J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324, 334 [2013]). Legislative acts nevertheless "enjoy a strong presumption of constitutionality[, and] . . . parties challenging a duly enacted statute face the initial burden of demonstrating the statute's invalidity beyond a reasonable doubt" (LaValle v Hayden, 98 NY2d 155, 161 [2002] [internal quotation marks and citations omitted]; see Schulz v State of N.Y. Exec., 134 AD3d 52, 55 [2015], appeal dismissed 26 NY3d 1139 [2016]).

Plaintiffs allege that Education Law § 2023-a and the tax freeze legislation run afoul of NY Constitution, article XI, § 1 (hereinafter the Education Article), which directs the Legislature to "provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." The Education Article does not require that equal educational offerings be provided to every student, but does mandate defendant State of New York "to offer all children the opportunity of a sound basic education" (Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 316 [1995]; see Reform Educ. Fin. Inequities Today [R.E.F.I.T.] v Cuomo, 86 NY2d 279, 283 [1995]; Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 47-48 [1982], appeals dismissed 459 US 1138, 1139 [1983]). As a result, even "gross educational inequities" will not give rise to a claim under the Education Article, and a plaintiff must allege "the deprivation of a sound basic education, and causes attributable to the State" in order to state a claim (New York Civ. Liberties Union v State of New York, 4 NY3d 175, 178-179 [2005]).

Plaintiffs acknowledge in their second amended complaint that they are not "seek[ing] to establish any specific . . . failure to provide a sound basic education" as a result of the

challenged legislative acts. They nevertheless suggest that their claim is viable because the Education Article acknowledges that "a system of local school districts exists and will continue to do so because the residents of such districts have the right to participate in the governance of their own schools" (New York Civ. Liberties Union v State of New York, 4 NY3d at 181 [internal quotation marks and citation omitted]; accord Paynter v State of New York, 100 NY2d at 442). It is true that "the Education Article enshrined in the Constitution a state-local partnership in which 'people with a community of interest and a tradition of acting together to govern themselves' make the 'basic decisions on funding and operating their own schools'" (Paynter v State of New York, 100 NY2d at 442, quoting Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d at 46). That being said, the provision is intended to ensure that education is "a responsibility of the State" (New York Civ. Liberties Union v State of New York, 4 NY3d at 182), and fundamentally protects against failures by the State to provide "adequate instruction and facilities" commensurate with that responsibility (Paynter v State of New York, 100 NY2d at 442; see Campaign for Fiscal Equity v State of New York, 100 NY2d at 922). Plaintiffs therefore state a viable Education Article claim only if they allege that the challenged legislation so impaired local financing ability that it implicated the State's "duty . . . to provide funding sufficient to bring the educational inputs locally available up to a minimum standard" (Paynter v State of New York, 100 NY2d at 442; see New York Civ. Liberties Union v State of New York, 4 NY3d at 182; Campaign for Fiscal Equity, Inc. v State of New York, 100 NY2d at 922; Reform Educ. Fin. Inequities Today [R.E.F.I.T.] v Cuomo, 86 NY2d at 283-284). They have made no effort to do so and, as such, their Education Article claim fails.

Plaintiffs next assert that Education Law § 2023-a and the tax freeze legislation deprive school children of their right to equal protection under the law. Education is not a fundamental right under either the Federal or State Constitutions and, absent any allegation that the challenged legislation discriminates against a suspect class, binding precedent establishes that "the rational basis test [is] the appropriate standard" (Campaign for Fiscal Equity v State of New York, 86 NY2d at 320; see San

Antonio Independent School Dist. v Rodriguez, 411 US 1, 40-44 [1973]; Reform Educ. Fin. Inequities Today [R.E.F.I.T.] v Cuomo, 86 NY2d at 285). The rational basis test is not demanding, and a statute will pass muster under it unless a challenger meets "the tremendous burden of demonstrating that no facts can reasonably be conceived to show the existence of a rational basis in support of some legitimate state interest in drawing the distinction" (Sullivan v Paterson, 80 AD3d 1051, 1053 [2011]; see People v Knox, 12 NY3d 60, 69 [2009], cert denied 558 US 1011 [2009]). The burden further rests on the challenger to rebut the presumption of validity and "negative every conceivable basis which might support [the challenged legislation] . . . whether or not the basis has a foundation in the record" (Affronti v Crosson, 95 NY2d 713, 719 [2001] [internal quotation marks, emphasis and citations omitted]; see Sullivan v Paterson, 80 AD3d at 1053).

Defendants suggest, and plaintiffs do not dispute, that Education Law § 2023-a and the tax freeze legislation were designed with the legitimate goal in mind of restraining onerous property tax increases that were believed to be depressing economic activity in the State (see e.g. Senate Introducer's Mem in Support, Bill Jacket, L 2011, ch 97, at 16). Plaintiffs suggest that it is irrational to achieve this legitimate aim in a manner that impairs local control of schools and deters poorer school districts that would otherwise seek a property tax increase over the tax cap to keep pace with educational needs. It suffices to say that, while Education Law § 2023-a and the tax freeze legislation incentivize districts and their residents to avoid property tax increases over the tax cap, neither prevents such increases if sufficient community support exists for them (see Education Law § 2023-a [6]). The differences in the services offered by various school districts accordingly result from a permissible consequence of local control over schools, namely, the variable "willingness of the taxpayers of [different] districts to pay for and to provide enriched educational services and facilities beyond what the basic per pupil expenditure figures will permit" (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d at 45). Inasmuch as there is nothing irrational in this, plaintiffs' equal protection claims fail (see San Antonio Independent School Dist. v Rodriguez, 411 US at 54-

55; Reform Educ. Fin. Inequities Today [R.E.F.I.T.] v Cuomo, 86 NY2d at 284-285; Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d at 44-47).

Plaintiffs lastly argue that Education Law § 2023-a and the tax freeze legislation offend the guarantee of due process afforded by the State and Federal Constitutions (see US Const 5th, 14th Amends; NY Const, art I, § 6). "Protection for certain fundamental rights is implicit within" those guarantees, and "[a] law that impinges upon a fundamental right is subject to strict scrutiny, whereas one that does not 'burden a fundamental right . . . is valid if it bears a rational relationship to [a legitimate governmental] interest'" (Samuels v New York State Dept. of Health, 29 AD3d 9, 13 [2006], affd sub nom. Hernandez v Robles, 7 NY3d 338 [2006], quoting Hope v Perales, 83 NY2d 563, 575 [1994]; see Washington v Glucksberg, 521 US 702, 719-721 [1997]). Plaintiffs point to two fundamental rights that are purportedly implicated here, the right to vote and the right to free speech.

Plaintiffs assert that the fundamental right to vote is impaired by the supermajority requirement imposed by Education Law § 2023-a (6), but they are incorrect (see Golden v Clark, 76 NY2d 618, 624 [1990]). A supermajority requirement passes constitutional muster unless it "discriminate[s] against or authorize[s] discrimination against any identifiable class," and nothing of the sort is alleged here (Gordon v Lance, 403 US 1, 7 [1971]; see Gray v Town of Darien, 927 F2d 69, 72 [2d Cir 1991], cert denied 502 US 856 [1991]). Plaintiffs further argue that the right to free speech is implicated by the tax freeze legislation, which will only grant an income tax credit to individuals in school districts that have enacted budgets complying with the tax cap imposed by Education Law § 2023-a (see Education Law § 2023-b [2]). Plaintiffs point out that "[t]o deny an exemption [or credit] to [individuals] who engage in certain forms of speech is in effect to penalize them for such speech" (Speiser v Randall, 357 US 513, 518 [1958]; see Rumsfeld v Forum for Academic and Institutional Rights, Inc., 547 US 47, 59 [2006]), but taxpayers remain free to vote as they wish in school budget elections, and their individual vote (or nonvote) will have no direct role in deciding their access to the tax

credit here.  Under these circumstances, taxpayers in school districts where budgets with tax levies exceeding the property tax cap are proposed and adopted "are not being denied a tax [credit] because they engage in constitutionally protected activities, but are simply being required to pay for [school property taxes] entirely out of their own pockets" rather than receiving a subsidy to offset those costs (Cammarano v United States, 358 US 498, 513 [1959] [emphasis added]; see Leathers v Medlock, 499 US 439, 450-453 [1991]; Regan v Taxation with Representation of Washington, 461 US 540, 546 [1983]).  Given that no fundamental rights are implicated by Education Law § 2023-a and the tax freeze legislation — and both are rationally related to the legitimate government interest of restraining crippling property tax increases — plaintiffs' substantive due process claims were properly dismissed.

Plaintiffs' remaining contentions, to the extent that they are properly before us, have been examined and rejected.

McCarthy, J.P., Garry and Clark, JJ., concur.


Lynch, J. (concurring in part and dissenting in part).

I respectfully dissent from that part of the majority that dismissed plaintiffs' claims under NY Constitution, article XI, § 1 (hereinafter the Education Article) and the Equal Protection Clause.  As plaintiffs candidly concede in their brief, a claim seeking additional state funding must allege that defendant State of New York has failed to provide the funding necessary for a sound basic education (see Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27 [1982], appeals dismissed 459 US 1138, 1139 [1983] [hereinafter Levittown]).  No such claim is being made here.  Instead, plaintiffs maintain that the tax cap and tax freeze credit enacted under Education Law §§ 2023-a and 2023-b unconstitutionally compromise their rights to local control over education funding.  This is, as plaintiffs concede, a novel argument.  Keeping in mind the procedural posture of this case, it is my view that plaintiffs have stated viable claims.

Under the challenged legislation, a school district may not

adopt a budget above a statutory "cap" – generally the lesser of 2% or the rate of inflation – without the approval of a supermajority of 60% of the voters (see Education Law § 2023-a). For a school district that adopts budgets within the tax cap, its taxpayers are eligible for a tax freeze credit (see Education Law § 2023-b). When a school district endeavors to adopt a budget in excess of the cap but fails, even upon resubmission to the voters, the district must levy a tax no greater than the tax levied in the prior school year (see Education Law § 2023-a [8]).

The majority has determined that plaintiffs' failure to seek additional funding is fatal to their claim under the Education Article. As the Court of Appeals recognized in Paynter v State of New York (100 NY2d 434 [2003]), however, the Court has "had no occasion to delineate the contours of all Education Article claims" (id. at 441; see New York Civ. Liberties Union v State of New York, 4 NY3d 175, 180 n 2 [2005]).

Education funding in New York derives from a dual system of local and state funding that dates back more than two centuries (see Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 326-327 [1995] [Levine, J., concurring]). Notwithstanding the resulting economic disparity between school districts throughout the State, the Court of Appeals upheld the constitutionality of this system in Levittown. Applying the rational basis standard delineated by the Supreme Court of the United States in San Antonio Independent School Dist. v Rodriguez (411 US 1 [1973]), the Court observed in Levittown "that the justification offered by the State – the preservation and promotion of local control of education – is both a legitimate State interest and one to which the present financing system is reasonably related" (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d at 44; see Campaign for Fiscal Equity v State of New York, 86 NY2d at 319-320). In Paynter, the Court elaborated:

> "[T]he Education Article enshrined in the [NY] Constitution a state-local partnership in which people with a community of interest and a tradition of acting together to govern themselves make the basic decisions on funding and

> operating their own schools . . . . The
> aim of the [Education] Article was to
> constitutionalize the established system
> of common schools rather than to alter its
> substance" (Paynter v State of New York,
> 100 NY2d at 442 [internal quotation marks
> and citations omitted]).

Through this structure, the State's constitutional obligation is to provide the additional funding that local school districts need to provide students with a sound basic education.

Our inquiry is not limited to a question of minimal funding. Rather, the focus must be on the ability of a local school district to provide funding for enriched educational programs that go beyond the bare minimum (see Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d at 45-46). Plaintiffs persuasively argue that the Education Article embraces and protects their rights to provide such funding. Pertinent to this point, the Court of Appeals cautioned in Levittown:

> "Any legislative attempt to make uniform
> and undeviating the educational
> opportunities offered by the several
> hundred local school districts — whether
> by providing that revenue for local
> education shall come exclusively from
> State sources to be distributed on a
> uniform per pupil basis, by prohibiting
> expenditure by local districts of any sums
> in excess of a legislatively fixed per
> pupil expenditure, or by requiring every
> district to match the per pupil
> expenditure of the highest spending
> district by means of local taxation or by
> means of State aid (surely an economically
> unrealistic hypothesis) — would inevitably
> work the demise of the local control of
> education available to students in
> individual districts" (id.).

In my view, the foregoing principles confirm that the right of local control is a protected interest under the Education Article that may not be compromised by undue State interference.

It bears further emphasis that, in San Antonio, the Supreme Court of the United States expressly declined to address the constitutionality of a state law establishing a maximum tax rate for school districts because no claim was made that the statutory ceiling barred any desired tax increases (San Antonio Independent School Dist. v Rodriguez, 411 US at 50 n 107). Here, in contrast, plaintiffs have asserted that the tax cap and tax freeze credit have, in effect, compromised their ability to enhance the services offered to their students. Plaintiffs further allege that the disparity in funding between wealthy and poor school districts throughout the State is exacerbated by the cap/credit. We thus have before us a constitutional claim comparable to that reserved for another day in San Antonio.

With respect to the equal protection claim, plaintiffs' basic argument is that students receiving a public education in wealthy districts have a greater ability to enjoy enhanced educational opportunities than similarly situated students receiving a public education in poor districts. By their complaint, plaintiffs maintain that the wealthiest school district in New York has more than 50 times the taxable wealth of the average district, while the poorest district has less than 19% of the taxable wealth of the average district. It is this wealth-based classification that plaintiffs assert has no rational relationship to our State's education funding structure (see Reform Educ. Fin. Inequities Today [R.E.F.I.T.] v Cuomo, 86 NY2d 279, 285 [1995]).

The applicable standard is whether there is a rational basis for the tax cap and credit (see San Antonio School Dist. v Rodriguez, 477 US at 40-44; Campaign for Fiscal Equity v State of New York, 86 NY2d at 314, 320; Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d at 41, 43-46). Here, according to defendants, the Legislature had a rational basis to enact the challenged legislation because New York had the highest local property taxes in the country as a percentage of personal income and it was necessary to reduce this burden and,

correspondingly, to enhance economic activity in the State. While this objective certainly has great statewide significance, it is difficult to discern how it bears any rational relationship to the access that all publicly educated children have to the funds available for public education. Given the asserted impediment to local control, we cannot conclude, as in <u>Levittown</u>, that the legislation is rationally related to "the permission and encouragement of participation in and control of public schools at the local district level" (<u>Board of Educ., Levittown Union Free School Dist. v Nyquist</u>, 57 NY2d at 41). For purposes of this motion, it is fair to assume a correlation between the "amounts of money expended and the quality and quantity of educational opportunity provided" (<u>id.</u> at 41 n 3). With the conceded disparate funding, compounded by the fact that taxpayers within the poorer school districts end up subsidizing, at least in part, the tax credits granted to taxpayers within the wealthier districts, I find that plaintiffs have stated a viable equal protection claim (see <u>Hargrave v Kirk</u>, 313 F Supp 944, 946 [MD Fla 1970], <u>vacated on other grounds sub nom.</u> <u>Askew v Hargrave</u>, 401 US 476 [1971]).


ORDERED that the orders are affirmed, without costs.


ENTER:

Robert D. Mayberger
Clerk of the Court