Matter of Buenos Hill Inc. v Saratoga Springs Planning Bd. (2024 NY Slip Op 24058)

[*1]

Matter of Buenos Hill Inc. v Saratoga Springs Planning Bd.

2024 NY Slip Op 24058

Decided on February 26, 2024

Supreme Court, Saratoga County

Kupferman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on February 26, 2024
Supreme Court, Saratoga County

In the Matter of the Application of Buenos Hill Inc., 
 a New York corporation, Petitioner/Plaintiff,

against
The Saratoga Springs Planning Board, THE CITY OF SARATOGA SPRINGS, DILLON MORAN, in his official capacity as the City of Saratoga Springs Commissioner of Accounts and City Clerk, City Assessor, Insurance Officer, Purchasing Agent, and Records Management Officer, TEN CEES, LLC, PISECO REALTY, LTD., NEW YORK STATE, THE NEW YORK STATE CANNABIS CONTROL BOARD, THE NEW YORK OFFICE OF CANNABIS MANAGEMENT, TREMAINE WRIGHT, in her official capacity as the Chairwoman of the New York State Cannabis Control Board, And CHRIS ALEXANDER, in his official capacity as Executive Director of the New York State Office of Cannabis Management, Respondents/Defendants.

Index No. EF20232528

William R. DiCenzo, Esq.
The Law Office of William R. DiCenzo
34-62 Junction Boulevard
Jackson Heights, New York 11372
Attorney for Buenos Hill, Inc.
Alexander Powhida, Esq. 
NYS Office of the Attorney General - Litigation Bureau
The Capitol Albany, New York 12224
Attorneys for New York State, the New York State 
Cannabis Control Board, the New York Office of 
Cannabis Management, Tremaine Wright, and 
Chris Alexander (collectively, the Moving Defendants)

Richard A. Kupferman, J.

Is marijuana legal in New York?
In March 2021, New York passed the Marihuana Regulation and Taxation Act ("MRTA") (see L 2021, Ch 92). The MRTA, which created the Cannabis Law, is intended to tax, control, and regulate recreational marijuana (see Cannabis Law § 2). This represents a significant change from prior policy that focused primarily on criminalization to control marijuana use (see Cannabis Law § 2). The Legislature found that the prior laws were "ineffective in reducing or curbing" marijuana use and "instead resulted in devastating collateral consequences" including mass incarceration, disproportionate impacts on minority communities, and unwarranted restrictions on a person's ability to access housing, employment opportunities, and other vital services (id.). The prior laws also created an illicit market and threatened public health (id.). 
The new policy now allows for adults 21 years of age or older to use and possess marijuana in moderate amounts (see Cannabis Law §§ 3[6], 13[3][a], & Article 4; Penal Law § 222.05). Businesses may also apply for a license to sell recreational marijuana (see Penal Law § 222.20; Cannabis Law §§ 72; 77). It is still illegal under New York law, however, to possess large amounts of marijuana, sell without a license, or operate a motor vehicle under the influence (see Cannabis Law §§ 2; 125; Penal Law § 222.00 et seq.; Vehicle and Traffic Law §§ 1192; 1227). In addition, the new laws are not intended to "require any individual to engage in any conduct that violates federal law or to exempt anyone from any requirement of federal law or pose any obstacle to the federal enforcement of federal law" (Cannabis Law § 2).
Cities, towns, and villages were provided with the option (if exercised by a specific deadline) to opt-out of that portion of the law allowing dispensaries and on-site consumption businesses to be located within their jurisdictions (see Cannabis Law § 131 [1]). For those municipalities that opted-out, the law allows them the opportunity to rescind their opt-out election at any time and to allow such businesses to operate within their jurisdiction (see id.). 
Municipalities that did not opt-out are now no longer permitted to opt-out (id. at § 131[1]&[2]). They are now "preempted from adopting any law, rule, ordinance, regulation or prohibition pertaining to the operation or licensure" of such businesses (id. at § 131[2]). Cities, towns, and villages, however, may still "pass local laws and regulations governing the time, place and manner of the operation" of these businesses, provided that "such law or regulation does not make the operation of such [businesses] unreasonably impracticable" (id.).
The plaintiff ("Buenos Hill") is the owner of real property located within the City of Saratoga Springs ("City"), a city which did not exercise the right to opt-out of the licensing scheme created by the MRTA. Buenos Hill alleges that it has been harmed by the local planning board's issuance of a special use permit for the operation of a marijuana dispensary at a neighboring property. Buenos Hill contends that the dispensary will plague its neighborhood [*2]with an increase in drug abuse, crime, homelessness, and hospitalizations. Buenos Hill also contends that the dispensary will cause a reduction in its property value and a decrease in its business. 
In addition to challenging the special use permit and the zoning law, Buenos Hill asserts two declaratory judgment claims against the Moving Defendants (including the State of New York), challenging the legality of the Cannabis Law (see CPLR 3001). Specifically, Buenos Hill asserts that the opt-out provision in the Cannabis Law violates the municipal home rule provisions of Article IX of the New York Constitution, and that the Cannabis Law is preempted by the Controlled Substances Act ("CSA") by way of the Supremacy Clause of the U.S. Constitution.
Prior to answering, the Moving Defendants sought to dismiss the claims against them pursuant to CPLR 3211(a)(7) for failure to state a cause of action. The parties briefed the legal issues and conducted oral argument (see NYSCEF Document No. 74). The Court further rendered a bench decision granting the motion dismissing the claims against the Moving Defendants.[FN1]
The Court has since performed additional research into the legal issues presented and, upon reconsidering the parties' contentions, stands by its prior determination dismissing the claims against the Moving Defendants for the reasons that follow. 
 The Fourth Cause of Action: The Opt Out Provision
Buenos Hill contends that the time limitation in the opt-out provision in the Cannabis Law violates the New York State Constitution. The Court, however, questions whether the issue is ripe for adjudication and whether a decision on this issue would be merely an advisory opinion. CPLR 3001 authorizes a court to render a declaratory judgment only as to "the rights and other legal relations of the parties to a justiciable controversy." "To constitute a 'justiciable controversy,' there must be a real dispute between adverse parties, involving substantial legal interests for which a declaration of rights will have some practical effect" (Chanos v Madac, LLC, 74 AD3d 1007, 1008 [2d Dept 2010]; see Park Avenue Clinical Hospital v Kramer, 26 AD2d 613, 613-614 [4th Dept 1966], affd without opn 19 NY2d 958 [1967]).
Here, the City presently does not desire to opt-out or prohibit the dispensary. Rather, the City desires to have the dispensary operate within its jurisdiction. As such, even if the Court were to invalidate the restriction placed on the City's ability to opt-out, it would not change anything for Buenos Hill. Moreover, to the extent that Buenos Hill contends that the City may later change its position, this alleges nothing more than a hypothetical adjudication "where the existence of a 'controversy' is dependent upon the happening of future events" (Park Avenue Clinical Hospital, 26 AD2d at 613 [internal quotation marks and citation omitted]). There is therefore no need to address this issue, as it may never mature into a justiciable controversy. Indeed, even assuming the City desired to opt-out in the future, the City could still resolve the matter with the State without the need for litigation or, alternatively, the Legislature could simply change the law. [FN2]

Notwithstanding, even assuming the case was ripe for adjudication, the Court would still dismiss this claim based on the strong presumption of constitutionality generally enjoyed by statutes and Buenos Hill's failure to satisfy the heavy burden of demonstrating that the statute is invalid (see Hotel Dorset Co. v Trust for Cultural Resources of City of NY, 46 NY2d 358, 370 [1978]; Farrington v Pinckney, 1 NY2d 74, 78 [1956]; see also New York State United Teachers v State of New York, 140 AD3d 90, 95 [3d Dept 2016]).
In support of its position, Buenos Hill contends that Article IX of the New York Constitution vests local municipalities with the unrestricted authority to determine whether to authorize marijuana dispensaries within their jurisdictions and that the State law cannot preempt local law on this issue. Buenos Hill also contends that the State cannot commandeer or compel its municipalities to give up their right to prohibit marijuana. These contentions are not supported by any applicable legal authority, and in fact they are contradicted by the plain language of Article IX of the New York Constitution.
Contrary to Buenos Hill's position, Article IX does not exclusively reserve for municipalities the sovereign power to exclusively control local activities within their jurisdictions. To the contrary, Article IX provides the State with the power to pass general laws to control and regulate matters of local concern (see NY Const, Article IX, § 2 [b][2]). Although Article IX, § 2(c) provides local governments with the power to adopt local laws relating to their property and affairs, this provision contains an important qualification: A local law may not be inconsistent with a general law passed by the State (see NY Const, Article IX, § 2 [c]). As such, the State possesses the power to pass a general law to preclude municipalities from interfering with the State's policy. 
Further, the Court disagrees that the Cannabis Law is a special law that required a home rule message under Article IX, § 2(b)(2). The difference between a special law and a general law concerns the applicability of the law rather than the specific subject matter of the law (see NY Const, Article IX, § 3[d]). As the Cannabis Law is a law of general, state-wide application, it is a general law to which a home rule message was not required. 
Indeed, Section 131 of the Cannabis Law allowed all municipalities an equal opportunity to opt-out within the timeframe provided by the statute. As is evident from the statutory language, all cities, towns, and villages shared alike in the ability to prohibit the establishment of retail dispensaries and on-site consumption businesses. The law likewise allows all who opted-out the ability to opt-in. As such, all localities are treated equally under the statute and the opt-out is general in application (see e.g. Radich v Council of City of Lackawanna, 93 AD2d 559, 564-565 [4th Dept 1983], affd 61 NY2d 652 [1983]). 
In addition, even assuming that the law was a special law, an exception to the home rule message requirement applies in cases such as this one, where the law is reasonably related to a matter of substantial state concern (see Empire State Chapter of Associated Builders and Contractors, Inc. v Smith, 21 NY3d 309, 313-319 [2013]; see also Patrolmen's Benevolent Ass'n of City of NY v City of New York ("PBA II"), 97 NY2d 378, 386 [2001]; Wambat Realty Corp. v State of New York, 41 NY2d 490, 495-498 [1977]). While Buenos Hill may disagree, the Court finds that the State does in fact have a strong interest in controlling and regulating [*3]marijuana throughout the State to promote the health and safety of its citizens.
For all these reasons, the Court dismisses the fourth cause of action.

The Fifth Cause of Action: The CSA
Turning to the fifth cause of action, the Moving Defendants assert two grounds for dismissal. First, they contend that Buenos Hill may not rely on the CSA as a basis to challenge the Cannabis Law (the "State law"). Second, they contend that the CSA does not preempt the State law. 

 Procedural Challenge
The Moving Defendants contend that the Court may not enter a declaratory judgment in favor of Buenos Hill on the fifth cause of action because Buenos Hill lacks any substantive legal rights to be vindicated under CPLR 3001. They assert that Buenos Hill is improperly attempting to assert rights under the CSA which do not exist for private citizens. They assert, and Buenos Hill does not dispute, that the CSA does not provide Buenos Hill with a private cause of action (see 21 USC § 801 et seq.; Safe Streets Alliance v Hickenlooper, 859 F3d 865 [10th Cir 2017]; Crimson Galeria Ltd. P'ship v Healthy Pharms, Inc., 337 F Supp 3d 20 [D Mass 2018]; Quillinan v Ainsworth, 2018 US Dist LEXIS 79431, 2018 WL 2151936 [ND Cal May 10, 2018]; Ringo v Lombardi, 2010 US Dist LEXIS 85365, 2010 WL 3310240 [WD Mo Aug 19, 2010]).
In contrast, Buenos Hill contends that it may nonetheless challenge the Cannabis Law on preemption grounds based on New York case law holding that a property owner and taxpayer has common law standing to challenge State legislative action (see e.g. Boryszewski v Brydges, 37 NY2d 361 [1975]). Buenos Hill also asserts generally that the regulation of property by zoning "may constitute a deprivation for purposes of the due process clause" (NYSCEF Document No. 61, Buenos Hill's MOL, at page 4 n 1).
The cases cited by Buenos Hill on this issue are distinguishable, as they do not involve the CSA or other federal statutes that limit their enforcement. In addition, Buenos Hill does not face any potential exposure under the CSA by complying with the State law, nor is Buenos Hill aggrieved by anything other than the State's refusal to enforce the CSA. Under these circumstances, Buenos Hill may not rely on the CSA to challenge the State law, regardless of whether it may challenge the State law on other grounds. The Court further declines to confer standing upon every citizen and taxpayer to challenge the State's marijuana policy based on the CSA. Such an extension, if permitted, would unnecessarily intrude into State and federal policy on this political issue (discussed below).

 Merits
Notwithstanding, even if the Court could reach the merits, it would still dismiss the claim. The crux of the claim is that the State law conflicts with the CSA and therefore should be declared unconstitutional and in violation of the Supremacy Clause of the U.S. Constitution. The general principles supporting this contention are well settled: the U.S. Constitution and federal law are the supreme law of the land (U.S. Const., Art. VI, Cl. 2) and "when federal and state law conflict, federal law prevails and state law is preempted" (Sutton 58 Assoc. LLC v Pilevsky, 36 NY3d 297, 305 [2020] [internal quotation marks and citations omitted]). The problem with the claim, however, is that it ignores the presumption against preemption, the statutory language, the case law, and the actions of the federal government in allowing states to implement recreational and medical marijuana laws. For all these reasons (discussed in more detail below), the Court disagrees that the CSA preempts the State law.
The Starting Presumption Against Preemption
"Although the Supremacy Clause invalidates state laws that interfere with, or are contrary to the laws of Congress, the exercise of federal supremacy is not lightly to be presumed" (Alessi v Raybestos-Manhattan, Inc., 451 US 504, 522 [1981] [internal quotation marks and citations omitted]). The courts should "start with the assumption that the historic police powers of the States were not to be superseded by [a federal law] unless that was the clear and manifest purpose of Congress" (Wyeth v Levine, 555 US 555, 565 [2009] [internal quotation marks and citations omitted]; see Sutton 58 Assoc. LLC, 36 NY3d at 305-307; see also Cipollone v Liggett Group, 505 US 504, 518 [1992] [construing the preemption provision narrowly "in light of the presumption against the [preemption] of state police power regulations"]). 
Here, the State law concerns the exercise of the State's police powers, its regulation and control over intrastate activities, and the health and safety of its citizens. As these matters are traditionally regulated by the states, a "starting presumption" exists that Congress did not intend to supplant state law (De Buono v Nysa-Ila Med. & Clinical Servs. Fund, 520 US 806, 814 [1997]). Moreover, Buenos Hill bears the "considerable burden" of overcoming this presumption (id.).
Plain Meaning Analysis
The CSA was enacted in 1970 during a national "war on drugs" (see Gonzales v Raich, 545 US 1, 10-12 [2005]). The legislation aimed to prevent drug abuse, control the supply and demand in controlled substances, and prevent the diversion of drugs from legitimate to illicit channels (see id. at 12-13, 19). To effectuate these goals, the CSA created "a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA" (id. at 13, citing 21 USC §§ 841[a][1], 844[a]). Under this system, marijuana was and remains classified as a Schedule I drug, making it a criminal offense to manufacture, distribute, or possess marijuana except as part of a pre-approved research study (see id. at 13-15).
Despite its comprehensiveness, Section 903 of the CSA demonstrates the "intent on the part of the Congress [not] to occupy the field in which [the CSA provisions operate], including criminal penalties, to the exclusion of any State law on the same subject matter" (21 USC § 903).[FN3]
By its own terms, the CSA was intended to preempt state law only when "a positive conflict" exists between the state law and the CSA on the same subject matter, such that "the two cannot consistently stand together" (21 USC § 903). 
The difficulty in applying the language in Section 903 in this case is that the potential conflict concerns the modern-day gap between state and federal marijuana policy (see Congressional Research Service ("CRS") Report, The Evolution of Marijuana as a Controlled [*4]Substance and the Federal-State Policy Gap [2022]; see also NYSCEF Document No. 44, CRS Report from 2019, at pages 23-27). As this policy gap did not emerge until after Congress enacted the CSA, it is dubious to assume that Congress ever considered this issue or formulated any intent on the matter when it enacted the CSA (see CRS Report from 2022 [explaining the history of marijuana regulation]; see also Robert A. Mikos, Preemption Under the Controlled Substances Act, 16 J Health Care Law & Policy 5, 13 [2013] [concluding that "there is very little known legislative history concerning the meaning of Section 903"]). 
If this policy debate simply involved whether marijuana should be legal, the Court might agree that it could use the language in Section 903 to discern Congress' intent on this preemption issue. The debate, however, extends well beyond this and concerns state rights, the efficient allocation of federal resources, and the health and safety of state citizens, all of which are important policy decisions that Congress would first need to resolve before the judiciary may utilize Section 903 to discern Congress' preemptive intent on this issue (see Erwin Chemerinsky et al., Cooperative Federalism and Marijuana Regulation, 62 UCLA L Rev 74 [2015] [discussing various issues involved in the debate and the different policy options available]). 
The gap between federal and state marijuana policy has also grown significantly over the years, with most states now deviating from the federal policy. This makes it even more likely that whatever limited policy decisions Congress made in 1970 on the issue of preemption are outdated and incapable of being used to determine how Congress intended to address the current situation.
The Tenth Amendment, moreover, would have prevented Congress from simply directing the states to implement federal drug policy. While the states may elect to voluntarily comply, Congress cannot compel them to enforce the CSA (Printz v United States, 521 US 898 [1997]; New York v United States, 505 US 144 [1992]).[FN4]
The Court is also unwilling to assume that Congress elected simply to preempt every state law that does not follow its policy on marijuana. The CSA contains no language to this effect and rather "explicitly contemplates a role for the States in regulating controlled substances" (Gonzales v Oregon, 546 US 243, 251 [2006]). Such an inflexible approach would also run counter to principles of federalism and would not necessarily promote the purpose of the CSA. 
Indeed, for states unwilling to follow its policy, Congress (if it ever considered the issue) may very well have preferred the State law (strict regulation) compared to the alternative (e.g., a more relaxed approach taken by states). As explained below, strict state regulation (although not [*5]exactly what Congress would have preferred) complements the CSA in many ways. Requiring a permit for a dispensary, for example, "appears to serve the goal of controlling the traffic in controlled substances, albeit to a weaker degree than criminal sanctions (but to a stronger degree than complete deregulation)" (Joe Hemp's First Hemp Bank & Distrib. Network v City of Oakland, 2016 US Dist LEXIS 11668, *9 [ND Cal Feb 1, 2016]). In contrast, the insistence on a more laissez-faire approach for these rebellious states (rather than allowing them to regulate) could cause the adverse effects associated with marijuana and the illicit market to go unmitigated and, in turn, frustrate the CSA's purpose, especially if the federal government is unwilling to expend the resources to enforce its marijuana policy. 
Overall, the Court finds that Section 903 cannot be used to preempt state law in a situation such as this one, where Congress did not manifest any such intent on the issue in the first place (see Sutton 58 Assoc. LLC, 36 NY3d at 306 [recognizing that "any preemption analysis requires [the court to] 'ascertain the intent of Congress'" (citation omitted)]; see also Wyeth, 555 US at 565). The Court is therefore powerless to find in favor of preemption, as such a finding in the absence of the requisite intent by Congress would encroach upon the function of the legislature and make law (and resolve a long-standing policy debate) rather than declare, construe, or enforce the law (see Ballentine's Law Dictionary, Judicial Legislation [3d ed 2010]).
Notwithstanding, even if Congress' intent could be discerned on this issue, the Court would find that the State law and the CSA can "consistently stand together" (21 USC § 903). The purpose of the State law is by no means repugnant to the CSA. The State law, for example, seeks to remove the problems associated with its own prior criminal laws; mitigate against the potential adverse effects created by the illicit market, which exists despite the CSA and regardless of state marijuana legislation; and address the disproportionate impact that its prior marijuana laws have had on minority communities. 
The State law also continues to criminalize more serious marijuana activity; limits the amount of marijuana that individuals may possess; and places several restrictions on the production and distribution of marijuana. While these restrictions may not extend as far as Congress desired in 1970, Congress most certainly would have preferred the State to enforce some limitations on marijuana use rather than nothing at all.
The State law further imposes strict regulation and control over marijuana. It allows the State to control the composition of marijuana products; issue licenses to only responsible businesses; impose hiring criteria to ensure that only trustworthy persons manufacture and distribute the product; impose minimum security standards; require businesses to maintain records and an inventory tracking system; and conduct regulatory audits to ensure compliance. The State may further terminate licenses and punish those who violate the rules (see Cannabis Law §§ 132; 133). 
This strict regulation promotes federal objectives in several ways, including by preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels; preventing licensed businesses from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity; and preventing the use of firearms in the cultivation and distribution of marijuana (see Cannabis Law § 1 et seq.; 9 NYCRR Parts 113-133; NYSCEF Document No. 60, Complaint filed in Canna Provisions, Inc. v Garland, No. 23-cv-30113 [D Mass 2023] [discussing the strict regulation imposed by states in the marijuana industry]). 
In addition, the strict regulation by states helps further the CSA's interest in preventing [*6]illicit marijuana from crossing state lines. Under a strict regulatory system, for example, the State can arguably distinguish state-regulated marijuana products by imposing labelling, tracking, and audit requirements on businesses. The State should therefore be able to track every seed and plant throughout the production and distribution process (see e.g. Michael Cooper, Safe Streets Alliance & the Tenth Amendment: Intrastate Cannabis Markets, Interstate Authority & Political Consequences, 18 UC Davis Bus LJ 195 [2018]; NYSCEF Document No. 60, Complaint filed in Canna Provisions, Inc. v Garland, No. 23-cv-30113 [D Mass 2023]). 
If successful, these tracing, labeling, and auditing requirements will significantly reduce, if not eliminate, the transfer of marijuana across state lines. However, even if these measures are ultimately unsuccessful, the federal government can easily reassert control over interstate supply by simply enforcing the CSA or enacting new legislation with a more expansive/specific preemption provision to address these concerns. This alleged conflict raised by Buenos Hill is therefore insignificant.
There is also no conflict based on the State's taxation of marijuana. It is well-settled that "the unlawfulness of an activity does not prevent its taxation" (Dept of Revenue of Mont. v Ranch, 511 US 767, 778 [1994]; see Marchetti v United States, 390 US 39, 44 [1968]). In fact, even the federal government taxes marijuana and collects revenue from illegal drug sales (see Standing Akimbo, LLC v United States, 955 F3d 1146 [10th Cir 2020]; IRS Publication 525 ["Income from illegal activities, such as money from dealing illegal drugs, must be included in your income ."]; see also Erwin Chemerinsky et al., Cooperative Federalism and Marijuana Regulation, 62 UCLA L Rev 74, 94 [2015]). Such taxation is therefore not preempted by the CSA.
Conflict Preemption Analysis
This decision is further consistent with conflict preemption analysis, which cases have applied to determine whether the CSA preempts state marijuana legislation. Under this analysis, a conflict exists when either (1) "compliance with both federal and state law is a physical impossibility," or (2) the state law at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (Matter of Quigley, 193 AD3d 207, 211 [3d Dept 2021] [internal quotation marks and citations omitted]; see Wyeth, 555 US at 555; Barnett Bank, N.A. v Nelson, 517 US 25 [1996]).[FN5]

Applying these tests, several cases have found that no conflict exists between the CSA and state marijuana legislation. Such cases generally conclude that compliance with both laws is physically possible so long as the state legislation does not require anyone to violate the CSA. Similarly, these cases further conclude that state marijuana laws do not create an obstacle to or interfere with the federal law or its enforcement (see e.g. Matter of Quigley, 193 AD3d at 207; Appeal of Panaggio [N.H. Comp. Appeals Bd.], 174 NH 89, 260 A3d 825 [NH 2021]; Noffsinger v SSC Niantic Operating Co. LLC, 273 F Supp 3d 326 [D Conn 2017]; White Mountain Health Ctr., Inc. v Maricopa Cnty., 241 Ariz 230, 386 P3d 416 [Ariz App 2016]; Reed-Kaliher v Hoggatt, 237 Ariz 119, 347 P3d 136 [Ariz 2015]; Ter Beek v City of Wyoming, 495 Mich 1, 846 NW2d 531 [Mich 2014]; Robert A. Mikos, Preemption Under the Controlled Substances Act, 16 J Health Care Law & Policy 5 [2013]).
In Matter of Quigley, for example, a workers' compensation carrier challenged a decision regarding the payment for claimant's medical marijuana treatment under New York's medical marijuana law (Compassionate Care Act). There, the Third Department held that the CSA did not preempt the state law. In applying the impossibility test, the Court determined that the state law did not require the carrier to manufacture, distribute, or possess marijuana and that the carrier was merely required to reimburse a claimant for the monetary costs associated with the medical marijuana, which is not expressly prohibited under the CSA (see Matter of Quigley, 193 AD3d at 211). The Court further found that the challenged conduct did not create an obstacle to federal enforcement of the CSA, holding that "requiring the carrier to reimburse claimant for said expenses does not serve to subvert, in any way, the principal purposes of the [CSA] in combating drug abuse and controlling 'the legitimate and illegitimate traffic in controlled substances' " (id. [citation omitted]).
As in Quigley and these other cases, the Cannabis Law readily satisfies these traditional tests. The State law does not require anyone to violate the CSA; nor does it attempt to supersede or interfere with federal law. The Cannabis Law itself expressly declares that the law is not intended "to require any individual to engage in any conduct that violates federal law or to exempt anyone from any requirement of federal law or pose any obstacle to the federal enforcement of federal law" (Cannabis Law § 2).
This case is distinguishable from those cases where state law sought to compel an individual to take an action in violation of the CSA. For example, in Crouse, the state law compelled officers to return marijuana to individuals found not guilty on a drug charge (see People v Crouse, 2017 CO 5, 388 P3d 39 [Colo 2017]). In Garcia, Burgoin, Musta and Emerald City, the courts found that the state laws "affirmatively required" an employer to accommodate marijuana use or reimburse a claimant for marijuana use (see Garcia v Tractor Supply Co., 154 F [*7]Supp 3d 1225 [D NM 2016]; Bourgoin v Twin Rivers Paper Company, LLC, 2018 ME 77, 187 A3d 10 [Maine 2018]; Musta v Mendota Heights Dental Ctr., 965 NW2d 312 [Minn 2021]; Emerald Steel Fabricators, Inc. v Bureau of Labor & Indus., 348 Ore 159, 230 P3d 518 [Ore 2010]). No such affirmative obligations exist in the Cannabis Law.
This case is further distinguishable from those cases concerning matters of foreign affairs and foreign commerce, which are traditionally reserved to the federal government to control. Such cases raise a presumption in favor of preemption "based in part on a need for federal uniformity regarding foreign commerce, which is 'pre-eminently a matter of national concern'" (Ouellette v Mills, 91 F Supp 3d 1, 8 [D Me 2015] [citations omitted]). In Oullette, for example, the Court held that federal law (the FDCA) preempted state law, finding that there was "clear Congressional intent to occupy the field of pharmaceutical importation" (id. at 12). Oullette, moreover, expressly distinguished itself from several marijuana cases on the ground that the marijuana cases did not involve field preemption (id. at 12).
Similarly, Buenos Hill misplaces reliance on Gonzales v Raich, 545 US 1 (2005). There, users and growers of marijuana for medical purposes under California law sought a declaration that the CSA was unconstitutional as applied to them. The U.S. Supreme Court rejected their arguments and held that the application of CSA was a valid exercise of Congress' powers under the Commerce Clause. The Court held that such was permissible given the substantial effects that intrastate marijuana could have on interstate commerce. Gonzales therefore addressed the authority of Congress to enact the CSA. However, it did not address the issue of preemption or conduct any preemption analysis.
Further, to the extent that Buenos Hill seeks to infer preemption merely from the comprehensive character of the CSA, a similar argument was rejected by the U.S. Supreme Court in a case involving the Social Security Act (see New York State Dep't of Soc. Servs. v Dublino, 413 US 405 [1973]). There, the Supreme Court explained, "modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem" (id. at 415).
The Federal Government's Enforcement Policy
The relief sought by Buenos Hill is also at odds with the federal government's enforcement policy. As summarized by a recent CRS Report, "the federal response to states' legalizing or decriminalizing marijuana largely has been to allow states to implement their own laws" while reaffirming that "marijuana growth, possession, and trafficking remain crimes under federal law irrespective of states' marijuana laws" (CRS Report, The Federal Status of Marijuana and the Expanding Policy Gap with States [2023]). Justice Thomas has characterized this approach as a "half-in, half-out regime that simultaneously tolerates and forbids local use of marijuana" (Standing Akimbo, LLC. v United States, 141 S Ct 2236, 2237 [2021]; see also Peridot Tree, Inc. v City of Sacramento, 2022 US Dist LEXIS 190046, 2022 WL 10629241 [ED Cal Oct 18, 2022]; Hager v M&K Const., 247 A3d 864 [NJ 2021]; NYSCEF Document No. 44, CRS Report from 2019, at pages 23-27). 
Despite the federal criminalization of marijuana, for example, Congress has included provisions in appropriations acts in each fiscal year since 2015 that prohibit the DOJ from "using appropriated funds to prevent certain states, territories, and DC from 'implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana'" (CRS Report, The Federal Status of Marijuana and the Expanding Policy Gap with States [2023]). In [*8]addition, in 2009, "Congress enabled Washington D.C.'s government to decriminalize medical marijuana under local ordinance" (Standing Akimbo, LLC., 141 S Ct at 2237).
Further, in 2009 and 2013, the DOJ "issued memorandums outlining a policy against intruding on state legalization schemes or prosecuting certain individuals who comply with state law" (Standing Akimbo, LLC., 141 S Ct at 2237). President Biden has also advocated for decriminalization, pardoned thousands of marijuana convictions for simple possession, and directed an expeditious review to determine how marijuana should be scheduled under the CSA (see Statement from President Biden on Marijuana Reform [October 6, 2022]).
Moreover, Congress has been provided with several options to address state-level legalization efforts and resolve the policy gap. Out of all the available options, Congress has elected to take "no action" which the Congressional Research Service has characterized as "maintaining the federal government's current marijuana policy" and "allowing states to carry on with implementation of recreational and medical marijuana laws" (CRS Report, The Federal Status of Marijuana and the Expanding Policy Gap with States [2023]).[FN6]

Congress' decision to not interfere with state recreational and medical marijuana laws, coupled with its awareness of the issue, is powerful evidence that Congress did not intend for the CSA to be the exclusive means of addressing the problems associated with drug abuse and safety (see Wyeth, 555 US at 575). As the U.S. Supreme Court has opined, "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them" (id., quoting Bonito Boats, Inc. v Thunder Craft Boats, Inc., 489 US 141, 166-167 [1989]).
So, yes, marijuana is legal in New York. But only if the federal government continues to allow the states to carry on with the implementation of their recreational and medical marijuana laws.
It is therefore,
ORDERED, ADJUDGED and DECREED, that the Moving Defendants' motion to dismiss the Amended Verified Petition and Complaint as against them is granted in its entirety with findings, declarations, and holdings, as follows:
1) Pursuant to CPLR 3001, the local-opt out, Section 131 of the Cannabis Law, is not violative of the Home Rule provisions of the New York Constitution; and
2) The Fourth Cause of Action in the Amended Verified Petition and Complaint is dismissed with prejudice; and
3) The Plaintiff lacks standing under the CSA to assert its challenge under the Supremacy Clause; and
4) Pursuant to CPLR 3001, the Cannabis Law is not pre-empted by the CSA; and
5) The Fifth Cause of Action in the Amended Verified Petition and Complaint is dismissed with prejudice; and
6) The Moving Defendants are awarded Judgment dismissing the Amended Verified Petition and Complaint as against them, with prejudice, and upon the filing and entry of this Order, the Clerk of the Court is directed to sever the Moving Defendants from the caption of this proceeding.
This shall constitute the Decision, Judgment, and Order of the Court. The Court is hereby uploading the original into the NYSCEF system for filing and entry by the County Clerk. The Court further directs the Moving Defendants to serve notice of entry in accordance with the Local Protocols for Electronic Filing for Saratoga County.
Dated: February 26, 2024
at Ballston Spa, New York
HON. RICHARD A. KUPFERMAN
Justice Supreme Court
Papers Considered: 
NYSCEF Document Nos. 28-44, 48-49, 56-58, 68

Footnotes

Footnote 1:The Court also conducted oral argument on a separate motion filed by the municipal defendants seeking to dismiss the complaint. That motion was denied (see NYSCEF Document Nos. 74, 77).

Footnote 2:The Court also questions whether Buenos Hill is the proper party to litigate this issue. The opt-out provision and the home rule protections do not concern Buenos Hill's "rights" or "legal relations." Rather, they concern municipal rights and the relationship between the State and its municipalities.

Footnote 3:Section 903 provides, as follows:
 "No provision of this title shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this title and that State law so that the two cannot consistently stand together" (21 USC § 903).

Footnote 4:This is known as the anticommandeering doctrine. In Printz, for example, the U.S. Supreme Court struck down as unconstitutional a federal statute requiring state and local law enforcement officers to perform background checks and related tasks in connection with applications for handgun licenses (Printz v United States, 521 US 898 [1997]). The Court held that the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program" (id. at 935). Similarly, in New York, the U.S. Supreme Court declared as unconstitutional a federal law that required the State, under certain circumstances, either to "take title" to low-level radioactive waste or to "regulat[e] according to the instructions of Congress" (New York v United States, 505 US 144, 175 [1992]). The Court held that the provision was unconstitutional because "the Constitution does not empower Congress to subject state governments to this type of instruction" (id. at 176).

Footnote 5:For cases considering whether a conflict exists, see Musta v Mendota Heights Dental Ctr., 965 NW2d 312 (Minn 2021); MRC44, LLC v City of Miami, 561 F Supp 3d 1288 (SD Fla 2021); Hager v M&K Const., 247 A3d 864 (NJ 2021); Appeal of Panaggio [N.H. Comp. Appeals Bd.], 174 NH 89, 260 A3d 825 (NH 2021); Tay v Kiesel [Matter of State Question No. 807], 2020 OK 57, 468 P3d 383 (Okla 2020); Chance v Kraft Heinz Foods Co., 2018 Del Super LEXIS 2526 (Super Ct, Del Dec 17, 2018); Bourgoin v Twin Rivers Paper Company, LLC, 2018 ME 77, 187 A3d 10 (Maine 2018); R.I. Patient Advocacy Coalition Found. (RIPAC) v Town of Smithfield, 2017 RI Super LEXIS 150 (Super Ct, RI Sept 27, 2017); City of Colo. Springs v Dab Lounge, LLC, 2017 Colo Dist LEXIS 918 (D Colo Sept 4, 2017); Noffsinger v SSC Niantic Operating Co. LLC, 273 F Supp 3d 326 (D Conn 2017); People v Crouse, 2017 CO 5, 388 P3d 39 (Colo 2017); White Mountain Health Ctr., Inc. v Maricopa Cnty., 241 Ariz 230, 386 P3d 416 (Ariz App 2016); Joe Hemp's First Hemp Bank v City of Oakland, 2016 US Dist LEXIS 11668, 2016 WL 375082 (ND Cal Feb 1, 2016); Garcia v Tractor Supply Co., 154 F Supp 3d 1225 (D NM 2016); Reed-Kaliher v Hoggatt, 237 Ariz 119, 347 P3d 136 (Ariz 2015); Ter Beek v City of Wyoming, 495 Mich 1, 846 NW2d 531 (Mich 2014); Pack v Superior Court, 199 Cal App 4th 1070, 132 Cal Rptr 3d 633 (Cal App 2011) (review granted but later dismissed due to mootness); Qualified Patients Ass'n v City of Anaheim, 187 Cal App 4th 734, 115 Cal Rptr 3d 89 (Cal App 2010); Emerald Steel Fabricators, Inc. v Bureau of Labor & Indus., 348 Ore 159, 230 P3d 518 (Ore 2010); Cnty. of San Diego v San Diego NORML, 165 Cal App 4th 798, 81 Cal Rptr 3d 461 (Cal App 2008); City of Garden Grove v Superior Court, 157 Cal App 4th 355, 68 Cal Rptr 3d 656 (Cal App 2007). See also, 60 ALR 6th 175 (2022).

Footnote 6:From a practical perspective, the legal gymnastics required by the nation's courts to affirm recreational marijuana could all be avoided by the federal government adopting a more stable marijuana policy. As outlined by the CRS, other available options include the following:
"Congress could decide that the CSA must be enforced and push for federal law enforcement to dismantle state medical and recreational marijuana programs. Or, it could continue to take smaller steps, such as enacting appropriations provisions that temporarily restrict DOJ's ability to expend funds to enforce federal marijuana laws in states with medical marijuana programs, or altering the CSA definition of marijuana. Congress may also decide to eliminate the gap altogether by de-controlling marijuana under the CSA and repealing associated criminal provisions" (CRS Report, The Federal Status of Marijuana and the Expanding Policy Gap with States [2023]).